**JAMES JULIAN, INC., Plaintiff,**

v.

**RAYTHEON COMPANY, Raytheon Service Company, Dean E. Bensley, Building and Construction Trades Council of Delaware, Frank DiMauro, Operating Engineers Local 542, Albert W. Spanich, Iron Workers No. 451, Edward F. Peterson, Metropolitan District Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America, and Wharf and Dock Builders and Pile Drivers Local Union No. 454 of the United Brotherhood of Carpenters and Joiners of America, Defendants.**

Civ. A. No. 80–30.

United States District Court, D. Delaware.

Sept. 25, 1980.

John Van Brunt, Jr., Wilmington, Del., for plaintiff; John W. Pelino, Edward J. O'Malley and Howard A. Rosenthal, Pelino & Lentz, P.C., Philadelphia, Pa., of counsel.

Edmund N. Carpenter, II, Richard G. Elliott, Jr., and Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del.; for defendants Raytheon Co., Raytheon Service Co. and Dean E. Bensley.

Sheldon Sandler, Bader, Dorsey & Kreshtool, Wilmington, Del., for defendants Building Trades Council of Delaware and Frank DiMauro; Richard B. Sigmond, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., of counsel.

Robert B. Coonin, Knecht, Greenstein, Schagrin & Berkowitz, Wilmington, Del., for defendants Operating Engineers Local 542 and Albert W. Spanich; Jack J. Bernstein, Adler, Barrish, Daniels, Levin & Creskoff, Philadelphia, Pa., of counsel.

Harvey B. Rubenstein, Wilmington, Del., for defendants Iron Workers Local 451 and Edward F. Peterson.

Clifford B. Hearn, Balick & Hearn, P.A., Wilmington, Del., for defendants Metropolitan District Council of Philadelphia and Vicinity and Wharf & Dock Builders Local 454; Thomas W. Jennings, Philadelphia, Pa., of counsel.

OPINION

MURRAY M. SCHWARTZ, District Judge.

In this action, plaintiff James Julian, Inc. ("Julian") seeks injunctive relief and damages against several labor organizations, individual union officers and Raytheon Company ("Raytheon") and Raytheon Service Company ("RSC") under sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2), section 303 of the Labor Management Relations Act (29 U.S.C. § 187), and state tort law. The union defendants have moved to dismiss Counts I, II and VI for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction.[1] For the reasons set forth below, the defendants' motion will be denied except with respect to Count I which will be granted at the end of 20 days unless in the interim Julian amends its complaint so as to allege sufficiently jurisdictional requisites. All other grounds for defendants' motions to dismiss will be denied.

I. INTRODUCTION

The defendants recognize the heavy burden facing them on their motions to dismiss. In the consideration of Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted, plaintiff is entitled to have all well pleaded allegations taken as true and the Court is to draw all reasonable inferences arising therefrom in favor of the plaintiff. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Similarly, when considering motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), where, as here, the motions attack the complaint on its face, the Court must take the allegations of the complaint as true. *Mortensen v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977).

II. PLAINTIFF'S ALLEGATIONS

The salient allegations of plaintiff's complaint (Doc. No. 1) are as follows. Julian, a Delaware corporation with its principal office and place of business in Wilmington, is engaged in the construction business, particularly, highways, utilities and other public works, both within and without the State of Delaware. Since 1961, Julian's employees have been represented by United Mine Workers District 50, now Local 15253 of the United Steel Workers of America ("USWA"), and are employed under an effective collective bargaining agreement between Julian and USWA, a fact known to the defendant unions. (¶¶ 3, 15, 16).

Sometime in 1976, Julian was approached by RSC, a Delaware corporation with its principal office and place of business in Massachusetts, with respect to RSC's efforts to secure a contract from the Dela-

---

1. Defendant Building Trades Council of Delaware ("Trades Council") and Frank DiMauro ("DiMauro"), alleged to be the President of the Trades Council (Doc. No. 1, ¶ 8), have moved to dismiss Count I (Sherman Act claim), Count III (section 303 claim), and Count VI (tort claim) for failure to state a claim upon which relief can be granted and, with respect to Counts I and VI, for lack of subject matter jurisdiction. (Doc. No. 18). Defendants Iron Workers Local 451 ("Iron Workers") and Edward F. Peterson ("Peterson"), alleged to be the business agent of the Iron Workers (Doc. No. 1, ¶ 12), have moved to dismiss Counts I, III and VI for lack of subject matter jurisdiction and failure to state a claim. (Doc. No. 19). Defendants Metropolitan District Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America ("Metropolitan District Council"), and Wharf and Dock Builders and Pile Drivers Local Union No. 454 of the United Brotherhood of Carpenters and Joiners of America ("Wharf and Dock Builders") have moved to dismiss Count I for failure to state a claim and for lack of subject matter jurisdiction and Count III for failure to state a claim. (Doc. No. 21). (Metropolitan District Council and Wharf and Dock Builders are not named defendants in Count VI.) Defendants Operating Engineers Local 542 ("Local 542") and Albert W. Spanich ("Spanich"), alleged to be business agent of Local 542 (Doc. No. 1, ¶ 10), have moved to dismiss "this action" for failure to state a claim. (Doc. Nos. 25, 26). Counsel for Trades Council and DiMauro filed a brief in support of their clients' motions and counsel for all other union defendants adopted this brief. Hereinafter, except where indicated, the phrase "defendant unions" will refer to the unions and individuals mentioned in this note.

ware Solid Waste Authority (the "Authority") to design and construct a solid waste disposal plant to be located south of Wilmington, Delaware. In response to RSC's solicitation, Julian entered into a letter of intent dated September 29, 1976, with respect to a proposal to be submitted by RSC to the Authority whereby RSC was to perform the design work with Julian performing the major portions of the construction work on the project. This letter of intent reflected an agreement between RSC and Julian that Julian would use specialty subcontractors on the project only to perform the electrical and mechanical work, with all other work to be performed by Julian. (¶¶ 5, 18, 19, 20).

On November 8, 1978, without informing Julian, Raytheon, a Delaware corporation with its principal office and place of business in Massachusetts, and RSC participated in a meeting with "representatives of the Trades Council and thirteen of its member trade unions including Local 542, the Iron Workers and the Wharf and Dock Builders. Defendants Spanich, Local 542's business agent, and Peterson, the Iron Workers president, also attended this meeting." (¶ 29). At that meeting, representatives of the Trades Council or one or more of its member unions, and specifically defendant Spanich, objected to any work being given to Julian and insisted instead that all work on the project be given to contractors whose employees were represented exclusively by the Trades Council or its member unions. These union representatives further advised Raytheon and RSC that they would disrupt and otherwise prevent or delay completion of the project if any work were given to Julian. (¶ 30).

On November 29, 1978, Raytheon and RSC attended a second meeting with representatives of the Trades Council and its member unions, including Local 542 and its business agent, defendant Spanich, in an effort to secure an understanding with the Trades Council and Local 542 which would satisfy the unions' objections to Julian performing work on the project. At that meeting, the Trades Council and Local 542 reiterated their threats to disrupt the

project if RSC proceeded to subcontract work to Julian or allow Julian to perform work on the project. Shortly after these meetings, negotiations between RSC and Julian with respect to the project intensified. Neither during these negotiations nor at any time prior to the execution of a contract between Julian and RSC did RSC inform Julian that it had attended meetings with the union or disclose that the Trades Council and its member unions had expressed to RSC their opposition to performance of the work by Julian. (¶¶ 31–34).

Subsequent to the execution of its contract with the Authority, RSC, without the knowledge or consent of Julian and contrary to the letter of intent, negotiated a subcontract with Raymond International Builders, Inc. ("Raymond"), whereby the latter was to perform all required piling work for a total price which was approximately $300,000 less than the amount which RSC was prepared to pay to Julian for the same work. RSC thereafter insisted, over Julian's objection, that Julian enter into the subcontract with Raymond that had been negotiated by RSC. At all times hereinafter mentioned, certain of Raymond's employees were represented by Local 542 and certain others by the Wharf and Dock Builders. (¶¶ 37, 38, 40).

Julian commenced work on the project on June 18, 1979. On June 26, consistent with its prior advice to Raytheon and RSC, and the understandings reached at the November 1978 meetings, Local 542, acting on behalf of and in concert with the Trades Council and its member unions, descended upon the construction site with approximately 200 persons, armed with clubs and rocks. These persons initially threatened and then attacked drivers and occupants of vehicles as they approached the site by breaking windows, slashing tires and physically assaulting and punching the passengers. In addition, these persons vandalized a crane and at least four other pieces of heavy equipment owned by Julian and then located at the site. At the time of that picketing, Local 542's pickets carried signs identifying themselves as members of or

picketing on behalf of Local 542 and defendant Spanich, the business agent of Local 542, was present on the site and was directing the picketing. This picketing and use of violence and physical force by Local 542 prevented free ingress and egress to this construction site by Julian's employees and other officials and persons who are required to have access to the project site, as well as access to the county landfill by state and/or local employees and officials. As a result of Local 542's picketing and other violent activities, Julian's equipment and business were severely damaged and the construction of the project was delayed. (¶¶ 50–55).

Julian further alleges that "in furtherance of the defendants' unlawful object and agreement to preclude Julian from performing work on the ... project" (¶ 56), the following conduct was engaged in. On or about August 22, 1979, Local 542 resumed its picketing of the construction site in violation of a settlement stipulation which it had entered into with the National Labor Relations Board. On or about October 17, 1979, the Iron Workers, directed by defendants Spanich and Peterson, following their observation of the project site on or about October 15, began picketing the job site. Beginning on or about October 23, 1979, the Trades Council engaged in mass picketing at the site with 200 to 500 pickets who were carrying signs identifying themselves as members of the Trades Council, causing all work at the project to cease. Julian alleges that these persons, armed with shotguns, rifles and sledge hammers, threatened the guard at the site with bodily harm if he attempted to interfere or other-

wise stop them and then attacked and vandalized the jobsite, destroying five office trailers situated on the site and causing damage to pieces of construction equipment parked at the rear of the trailer. Finally, Julian alleges that picketing by the Trades Council and/or its member unions continued uninterrupted through December 17, 1979, when Julian, having completed all of the work under its subcontract with RSC which it could then perform under the construction schedule, removed its employees from the jobsite. (¶¶ 56a–e).

On or about September 10, 1979, Raymond had commenced its work on the project. However, from the commencement of the picketing by the Trades Council and its member unions on or about October 17 through December 17, Raymond failed and refused to prosecute the work required under its contract with Julian. Consequently, all of the work required under the terms of Julian's subcontract with RSC could not be completed as scheduled. Julian alleges that the picketing and other activities by all union defendants was consistent with the goals previously expressed by the union defendants to Raytheon and RSC to exclude Julian from the project and the understandings reached by and between Raytheon, RSC and the Trades Council and its member unions, and was undertaken to provide RSC with a purported basis for terminating Julian's contract. (¶¶ –57–60).

### III. SHERMAN ACT CLAIMS

In Count I, Julian alleges that, by entering into an agreement with Raytheon and RSC to force Julian off the construction project, the unions violated sections 1 and 2 of the Sherman Act.[2] The unions defend

---

2. Section 1 of the Act, 15 U.S.C. § 1, provides:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceed-

ing three years, or by both said punishments, in the discretion of the court.
 Section 2 of the Act, 15 U.S.C. § 2 provides:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment

against Count I, in part, by claiming exemption from antitrust liability.

### A. Statutory Exemption

The "labor exemption" from antitrust liability has its origin in section 6 of the Clayton Act, 15 U.S.C. § 17, which provides that

[t]he labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help, ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17; *see also* 29 U.S.C. § 52 (section 20 of Clayton Act); 29 U.S.C. §§ 104, 105, 113 (sections 4, 5, 13 of Norris–LaGuardia Act).

 It is well settled that the exemption from antitrust liability accorded to labor organizations by these statutory provisions does not apply when such organizations act in concert with non–labor parties. *See Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–1835, 44 L.Ed.2d 418 (1975); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 662, 85 S.Ct. 1585, 1589, 14 L.Ed.2d 626 (1965); *Allen Bradley Co. v. Local Union No. 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council,* 609 F.2d 1368, 1372 (3d Cir. 1979), *Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494, 511 (3d Cir. 1979), *vacated on other grounds* —— U.S. ——, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980).[3] Defendant

unions recognize this principle of law, but contend that Julian has not sufficiently pled an agreement or combination among themselves and non–labor parties such as Raytheon and RSC. This contention is without merit. While the mere general allegation of a conspiracy is insufficient for pleading purposes in an antitrust action, *Leeward Petroleum, Ltd. v. Mene Grande Oil Co.,* 415 F.Supp. 158 (D.Del.1976), courts are to be "extremely liberal in construing antitrust complaints." *Knuth v. Erie–Crawford Dairy Cooperative Association,* 395 F.2d 420, 423 (3d Cir. 1968). In its complaint, Julian has set out the parties to the alleged conspiracy, the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose. These allegations, if proven, are precise enough to give rise to an inference of a conspiracy. *See Leeward Petroleum, Ltd., supra,* 415 F.Supp. at 163; *Turley v. Hall's Motor Transit Co.,* 296 F.Supp. 1183, 1187 (M.D.Pa.1969) ("when conspiracy is charged, there should be some details of time, place, and the alleged effect of the conspiracy."). Accordingly, given Julian's adequate allegations of a conspiracy or agreement between the union defendants and non–labor parties, the defendant unions' reliance upon the statutorily–based labor exemption is unavailing.

### B. Nonstatutory Exemption

The defendant unions contend that any agreement with Raytheon and RSC is within the nonstatutory labor exemption. In *Connell Construction Co., supra,* the Supreme Court discussed the origin of the nonstatutory labor exemption.

The Court has recognized ... that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union–employer agreements be accorded a limited nonstatutory exemption

---

not exceeding three years, or by both said punishments, in the discretion of the court.

**3.** For a complete discussion of the statutory and judicial development of the labor exemption from antitrust liability, *see* R. Gorman, *Basic Text on Labor Law* at 621–38 (1976).

from antitrust sanctions. *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676 [85 S.Ct. 1596, 14 L.Ed.2d 640] (1965).

The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. See *Mine Workers v. Pennington, supra*, [381 U.S.] at 666 [85 S.Ct. at 1591]; *Jewel Tea, supra*, [381 U.S.] at 692–693 [85 S.Ct. at 1603–1604] (opinion of White, J.). Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, *e. g., Federation of Musicians v. Carroll*, 391 U.S. 99 [88 S.Ct. 1562, 20 L.Ed.2d 460] (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.

421 U.S. at 622–23, 95 S.Ct. at 1835.

In *Connell*, the Court held the labor exemption inapplicable to a union–employer agreement in which Connell agreed to subcontract mechanical work only to firms that had a current contract with Local 100, the Court finding that this agreement "indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient

operating methods." 421 U.S. at 623, 95 S.Ct. at 1835.

■ The Third Circuit Court of Appeals recently summarized its understanding of the holding in *Connell*:

> We understand *Connell* to hold, then, that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.

*Larry V. Muko, Inc., supra*, 609 F.2d at 1373. In *Muko*, the court reversed the district court's grant of a directed verdict in favor of the union defendants, finding that, on the record before it, a jury could have found such an agreement. 609 F.2d at 1374. Similarly, in the case *sub judice*, looking solely to the well pleaded allegations of plaintiff's complaint, this Court cannot conclude that any agreement which might be found is, as a matter of law, within the nonstatutory labor exemption. It is possible that Julian can prove an anticompetitive agreement among the unions, Raytheon and RSC to exclude contractors without contracts with the defendant unions without regard to whether the competitive advantage of such contractors derived from more efficient operating methods rather than from substandard wages and working conditions.

■ The union defendants argue, however, that the alleged agreement entered into by themselves and Raytheon and RSC is protected by section 8(e) of the Labor Management Relations Act, 29 U.S.C. § 158(e), and, therefore, is not subject to antitrust liability.[4] Specifically, the unions

---

4. Section 8(e) provides in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or

refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or

contend that this agreement is protected by the construction industry proviso to section 8(e) which protects agreements between unions and employers in the construction industry "relating to the contracting or subcontracting of work to be done at the site of construction ...." [5] In *Connell*, the Supreme Court adopted a narrow view of the effect of the 8(e) proviso:

> [W]e think its authorization extends only to agreements in the context of collective-bargaining relationships and in light of congressional references to the *Denver Building Trades* problem, possibly to common-situs relationships on particular job-sites as well.

421 U.S. at 633, 95 S.Ct. at 1840 (footnote omitted).

The unions do not contend that their alleged agreement with Raytheon and RSC was in the context of a collective bargaining relationship. Moreover, the applicability of the 8(e) proviso to common-situs situations does not aid the defendants in the instant case, as there is no allegation that the defendant unions sought to exclude *nonunion* subcontractors from the construction project.[6] Rather, the allegation by Julian is that the alleged agreement sought to exclude *non–Building Trades* subcontractors. In fact, Julian alleges that its employees were represented by a union, District 50, USWA, and that the defendant unions were aware of this fact. It follows that neither of the two circumstances in which the Supreme Court held the 8(e) proviso to apply—agreements in the context of

---

agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subjection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

5. Clearly, the agreement alleged in the instant case would be illegal under section 8(e) absent this proviso. RSC and Raytheon are alleged to have agreed with the unions to "cease doing business" with Julian.

6. A reading of *Connell* makes it clear the "problem" alluded to in the Court's citation to "congressional references to the *Denver Building Trades* problem," 421 U.S. at 633, 95 S.Ct. at 1840, was the picketing of a single nonunion subcontractor on a multiemployer building project and the possibility that union workers would be forced to work alongside nonunion workers. *See id.* at 629–32, 95 S.Ct. at 1838–1839. Neither of these concerns is involved here.

The attention of the Court has been directed to four decisions of the National Labor Relations Board and to a Ninth Circuit Court of Appeals decision denying enforcement, in large part, of two of the decisions. Carpenters Local No. 944, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, 239 N.L.R.B. 241, 99 L.R.R.M. 1580 (1978); Colorado Building & Construction Trades Council, 239 N.L.R.B. 253, 99 L.R.R.M. 1601 (1978); Los Angeles Building and Construction Trades Council, 239 N.L.R.B. 264, 99 L.R.R.M. 1593 (1978); International Union of Operating Engineers, Local No. 701, AFL–CIO, 239 N.L.R.B. 274, 99 L.R.R.M.

1589 (1978); *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. N.L.R.B.,* 609 F.2d 1341, 103 L.R.R.M. 2144 (9th Cir. 1979). These decisions, however, do not change the result of the instant case. In three of the four decisions (239 N.L.R.B. 241, 239 N.L.R.B. 264 and 239 N.L.R.B. 274), the Board held the unions' conduct to be protected under section 8(e) because it was undertaken in the context of a collective bargaining relationship. In the fourth decision (239 N.L.R.B. 253), the Board denied the protection of the construction industry proviso to conduct undertaken outside a collective bargaining relationship where the union did not seek the agreement for purposes of organizing a nonunion subcontractor on the building project it picketed and where the agreement sought by the union allowed for the possibility of union and nonunion employees working side–by–side at a jobsite. In rejecting the Board's approach to the decision in *Connell*, the Ninth Circuit Court of Appeals held that

> the construction industry proviso extends shelter only when a collective bargaining relationship exists and even then only when the employer or his subcontractor has employees who are members of the signatory union at work at some time at the jobsite at which the employer wishes to engage a nonunion subcontractor.

609 F.2d at 1347.

As alleged by Julian, the defendant unions' conduct was not concerned with excluding nonunion contractors and was not undertaken in the context of a collective bargaining relationship. Therefore, the unions cannot, at this stage of the proceedings, gain the protection of the section 8(e) proviso. *See* note 7 *infra.*

collective–bargaining relationships and the existence of a common–situs situation–is present in the instant case. The defendant unions are unable, at least at this time,[7] to claim the nonstatutory labor exemption from antitrust liability.

### C. Jurisdiction [8]

 The unions' final contention with respect to Julian's Sherman Act claims is that the complaint fails to set forth the requisite impact on interstate commerce necessary to invoke federal jurisdiction over an action under the antitrust laws. Defendants' argument is well–taken. Although Julian refers in its brief to certain "facts," such as the "substantial amounts of materials and supplies" to have been received by Julian from outside the State of Delaware and the exclusion of out–of–state contractors from the construction project, that would lead to a conclusion that Julian had sufficiently alleged federal jurisdiction, such representations are not contained in the complaint and, therefore, may not be considered by the Court. At the present time, Julian's complaint merely alleges that the defendant unions, some of whom are located outside the State of Delaware, agreed with Raytheon and RSC, whose principal places of business are in Massachusetts, to exclude Julian, a Delaware corporation, from working at a jobsite located in Delaware. These allegations are insufficient to satisfy either the "in commerce" or "affecting commerce" tests. *Cf. Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (complaint alleging impact on out–of–state purchases, revenues, financing and payments sufficient to establish jurisdic-

tion); *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48 (3d Cir. 1973) (complaint and supporting affidavit alleging impact on out–of–state purchases of supplies, disbursements, investments, and patients sufficient). However, in light of 28 U.S.C. § 1653 which provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts," and the principle that "[a]ntitrust litigation should not be disposed of without giving plaintiff a full opportunity to formulate [its] charges," *Elliott & Frantz, Inc. v. Raygo, Inc.*, 379 F.Supp. 498, 503 (E.D.Pa.1974); *see Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Stokes Equipment Co. v. Otis Elevator Co.*, 340 F.Supp. 937 (E.D. Pa.1972), plaintiff will be permitted a period of 20 days to amend its complaint so as to sufficiently allege restraint of interstate commerce. If plaintiff does so, the union defendants' motions to dismiss Count I will be denied.

### IV. SECTION 303 CLAIM.

 In Count II, Julian seeks to recover damages from the Trades Council, Local 542, Iron Workers, Metropolitan District Council, and Wharf and Dock Builders under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187. Section 303 permits damage actions against labor organizations which engage in conduct violative of section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). Section 8(b)(4) makes it an unfair labor practice for a labor organization, *inter alia*, to

> threaten, coerce, or restrain any person engaged in commerce or in an industry

---

7. Since this decision is based solely upon a reading of Julian's complaint, it does not foreclose the possibility that, upon the presentation of further evidence by the defendants, the labor exemption will in fact be applicable. *See Larry V. Muko, Inc., supra*, 609 F.2d at 1375.

8. One argument advanced by the defendant unions may quickly be rejected. The unions contend that the Norris–LaGuardia Act prohibition against injunctive relief in labor disputes deprives this Court of jurisdiction to issue relief to Julian under the antitrust laws. It is "be-

yond question that nothing in the anti--injunction provisions of the Norris-LaGuardia Act ... insulates a combination in illegal restraint of trade between businessmen and a labor union from the sanctions of the antitrust laws. *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed. 1939]." *Los Angeles Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 99–101, 83 S.Ct. 162, 165, 9 L.Ed.2d 150 (1962); *see also Robertson v. National Basketball Association*, 389 F.Supp. 867, 880 (S.D.N.Y.1975).

affecting commerce, where . . . an object thereof is—

(A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by [section 8(e)];

(B) forcing or requiring any person . . . to cease doing business with any other person . . . .

The unions contend that Julian has merely alleged that Raytheon, RSC and the unions "voluntarily" entered into an agreement that RSC and Raytheon would cease to deal with Julian and that, therefore, the unions could not have "threatened, coerced or restrained" RSC and Raytheon.

The complaint, however, is replete with allegations of threats and coercion which, if true, would satisfy 8(b)(4). *See, e. g.*, ¶¶ 30, 32, 52, 54, 56. As the unions recognize, an agreement violative of section 8(e) need not be entered into "voluntarily" by an employer; *see Connell, supra*, 421 U.S. at 620, 95 S.Ct. at 1834. Thus, there is no inconsistency between Julian's allegation of an agreement between the unions and non–labor parties and its allegation that the unions threatened or coerced those parties into entering that agreement. Since Julian has sufficiently alleged that the defendant unions threatened, coerced or restrained Raytheon and RSC to cease doing business with Julian or to enter into an agreement violative of section 8(e), the unions' motion to dismiss Count III will be denied.

## V. ALLEGATIONS AGAINST INDIVIDUAL DEFENDANTS

█ Defendants, DiMauro, Spanich and Peterson contend that Counts I and VI should be dismissed as to them because of Julian's failure to plead specific allegations of conduct by them. The Court concludes that, at this stage of the proceedings, Julian has alleged sufficient conduct by all three individual defendants so as to merit denial of their motion. *See e. g.*, ¶¶ 29, 30, 31, 53, 56, 66, 75. A similar argument was rejected by Chief Judge Latchum in *Athletes Foot of Delaware, Inc. v. Ralph Libonati Co., Inc.*, 445 F.Supp. 35, 50 (D.Del.1977) (footnotes omitted):

Although defendant Cavall is correct when he notes that the complaint is ambiguous concerning his role in the alleged conspiracy, that is an issue which should be raised at a later date when the record is more fully developed. Furthermore, there is no requirement that a plaintiff plead with particularity every overt act allegedly committed by a defendant in furtherance of a conspiracy or the precise role played by an alleged conspirator. Cavall's objection on this ground could more properly be expressed in a motion for a more definite statement of the claim under Rule 12(e), F.R.Civ.P., or, after additional discovery, in a motion for summary judgment under Rule 56, F.R. Civ.P.

The motions to dismiss by defendants DiMauro, Spanich and Peterson will be denied.

## VI. STATE TORT CLAIMS

█ The defendants named in Count VI have moved to dismiss Julian's tort claims for lack of pendent jurisdiction. In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court stated that

[p]endent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court.... The state and federal claims must derive from a common nucleus of operative fact.

383 U.S. at 725, 86 S.Ct. at 1138 (footnote omitted).

Clearly, in light of the common nucleus of fact involved in both the federal and state claims and the continued presence in this action of Julian's section 303 claim, the Court has the *power* to assert jurisdiction over Count VI. Moreover, the defendants

have not pointed to anything that would lead the Court not to exercise its "discretion" to entertain the state law claims. *See United Mine Workers of America v. Gibbs, supra*, at 726–27, 86 S.Ct. at 1138–1139. *Cf. Merritt v. Colonial Foods, Inc.*, 499 F.Supp. 910 (D.Del.1980).

For the reasons set forth in this Opinion, an Order will be entered denying the defendants' motions to dismiss Counts III and VI and denying their motions to dismiss Count I provided Julian amends its complaint, within 20 days, to sufficiently set forth federal jurisdiction over Count I.