**JAMES JULIAN, INC., Plaintiff,**

v.

**RAYTHEON COMPANY, Raytheon Service Company, Dean E. Bensley, Building and Construction Trades Council of Delaware, Frank DiMauro, Operating Engineers Local 542, Albert W. Spanich, Iron Workers No. 451, Edward F. Peterson, Metropolitan District Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America, and Wharf and Dock Builders and Pile Drivers Local Union No. 454 of the United Brotherhood of Carpenters and Joiners of America, Defendants.**

**Civ. A. No. 80–30.**

United States District Court,
D. Delaware.

Feb. 16, 1983.

See also 93 F.R.D. 138.

John W. Pelino, Edward J. O'Malley and Howard A. Rosenthal, Pelino & Lentz, P.C., Philadelphia, Pa., for plaintiff; John Van Brunt, Jr., Wilmington, Del., of counsel.

Harvey B. Rubenstein, Wilmington, Del., for defendants Iron Workers Local 451 and Edward F. Peterson.

Edmund N. Carpenter, II, Richard G. Elliott, Jr., and Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., for defendants Raytheon Co., Raytheon Service Co. and Dean E. Bensley.

Richard B. Sigmond, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for defendants Building and Construction Trades Council of Delaware and Frank DiMauro; Joseph W. Benson, Brandt & Benson, Wilmington, Del., of counsel.

Jack J. Bernstein, Adler, Barrish, Daniels, Levin & Creskoff, Philadelphia, Pa., for defendants Operating Engineers Local 542 and Albert W. Spanich; Robert B. Coonin, Knecht, Greenstein, Schagrin & Berkowitz, Wilmington, Del., of counsel.

Thomas W. Jennings, Philadelphia, Pa., for defendants Metropolitan Dist. Council of Philadelphia and Vicinity and Wharf & Dock Builders Local 454; Clifford B. Hearn, Balick & Hearn, P.A., Wilmington, Del., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Plaintiff, James Julian, Inc. ("Julian"), a subcontractor on a construction project known as the Delaware Reclamation Project ("Project"), instituted the current action in January 1980. Defendants are Raytheon Company ("Raytheon"), Raytheon Service Company ("RSC"),[1] various labor

---

1. RSC is a wholly owned subsidiary of Raytheon.

organizations,[2] and several named individuals.[3] Julian seeks injunctive relief and damages under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 ("Sherman Act"), section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 ("LMRA"), and state tort law. Presently before the Court is the motion of defendants Iron Workers and Peterson for summary judgment.[4]

The prior opinion of this Court adequately sets forth the factual background of this dispute. *See James Julian, Inc. v. Raytheon Co.*, 499 F.Supp. 949, 953–54. Five basic alleged factual occurrences underlie Julian's cause of action: first, in 1976, Julian entered into an agreement by means of a letter of intent with RSC to perform construction work on a solid waste disposal plant for the Delaware Solid Waste Authority ("Authority"); second, on November 8, 1978 and November 29, 1978, Raytheon and RSC met with representatives of the Authority, the Trades Council and thirteen member unions who objected to Julian's participation in the Project, insisted that all work be performed by contractors whose employees were represented by the Trades Council or its member unions, and threatened to disrupt the construction should Julian remain;[5] third, violent picketing occurred on June 26, 1979; fourth, picketing accompanied with threats of harm occurred from October of 1979 to December of 1979; and fifth, as a consequence, Julian was unable to complete work on the project as scheduled and RSC terminated Julian's subcontract. These events, *inter alia,* alleges Julian, amounted to a combination or conspiracy between Raytheon, RSC and the union defendants to remove Julian from the project altogether. Allegedly, Raytheon and RSC eventually acceded to the demands of the Trades Council and its member unions by first depriving Julian of portions of work,[6] and ultimately by terminating Julian's contract.[7]

Of all defendants, only the Iron Workers and Peterson [hereinafter referred to as the "moving defendants"] have moved for summary judgment. The complaint raises allegations against the moving defendants in three of the six counts: first, Count I alleges a combination or conspiracy in violation of sections 1 and 2 of the Sherman Act; second, Count III alleges a violation of section 303 of the LMRA; and third, Count VI alleges a violent and illegal trespass in violation of state tort law. By and large, the moving defendants answer these claims by asserting a total lack of admissible evidence to establish the factual predicate for each claim. The parties focus first on the standard governing a summary judgment mo-

2. These include: The Building and Construction Trades Council of Delaware ("Trades Council"); Operating Engineers Local 542; Iron Workers No. 451 ("Iron Workers"); Metropolitan District Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America; and Wharf and Dock Builders and Pile Drivers Local Union No. 454 of the United Brotherhood of Carpenters and Joiners of America.

3. These include: Dean E. Bensley; Frank DiMauro; Albert W. Spanich; and Edward F. Peterson.

4. A prior motion by the union defendants to dismiss Julian's action for failure to state a claim and lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) & 12(b)(6) was denied by this Court. *James Julian, Inc. v. Raytheon Co.*, 499 F.Supp. 949 (D.Del.1980).

5. Julian's employees are, and since 1961 have been, represented by United Mine Workers District 50, now Local 15253 of the United Steel Workers of America, and are employed under an effective collection bargaining agreement. Obviously, Local 15253 is not a member of the Trades Council.

6. Plaintiff asserts that unbeknownst to Julian, and after the letter of intent was entered with Julian, RSC negotiated a subcontract with Raymond International Buildings, Inc. ("Raymond"), whereby the latter was to perform all piling work on the project. RSC insisted that Julian enter into the subcontract with Raymond that RSC had negotiated. Certain of Raymond's employees were represented by member unions of the Trades Council. Complaint, Docket Number ("Dkt. No.") 1 ¶¶ 37, 38, 40.

7. Raymond employees honored the picket line, thereby causing substantial delays on the completion of piling work.

tion in the context of antitrust litigation, and second on whether that standard has been met.

## I. Summary Judgment Standard

The United States Court of Appeals for the Third Circuit recently had occasion to summarize the standards for summary judgment:

> "Rule 56 of the Federal Rules of Civil Procedure provides that a trial court may enter summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' We have characterized summary judgment as 'a drastic remedy,' and have made clear 'that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties.' Moreover, '[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion.' 'On review the appellate court is required to apply the same test the district court should have utilized initially.'"

*Sunshine Books, Ltd. v. Temple University,* 697 F.2d 90, 95 (3d Cir.1982) (quoting *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981)) (citations omitted).

■ Plaintiff has submitted a host of documentary evidence and references to deposition testimony in response to the moving defendants' motion. Conversely, the moving defendants submit in support of their motion only a cursory affidavit of defendant Peterson which denies participation in any combination or conspiracy.[8] In light of this sworn denial of the existence of a Sherman Act violation, the plaintiff must produce significant probative evidence which demonstrates the existence of a factual dispute as to the allegations in the complaint. *Sunshine Books, Ltd. v. Temple University,* 697 F.2d at 96 (3d Cir.1982); *see also Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir.1975); *Boulware v. Parker,* 457 F.2d 450, 452 (3d Cir.1972).

■ Basically, plaintiff offers three incidents which, it alleges, constitute sufficient probative evidence of the moving defendants' participation in the conspiracy in violation of the Sherman Act.[9] These three

---

**8.** The Peterson affidavit states in part:

4. Neither I nor anyone else acting on my behalf or on behalf of Iron Workers Local 451 ever attempted to preclude Julian from performing work at Julian's job site or ever sought to terminate Julian's subcontract with Raytheon or ever sought, participated in or had knowledge of any contract, combination or conspiracy, express or implied, for such purposes.

5. Neither I nor anyone else acting on my behalf or on behalf of Iron Workers Local 451 ever sought or attempted to force or require any other person, including Julian's subcontractors, to cease doing business with Julian or to terminate subcontracts with Julian.

6. Neither I nor anyone else acting on my behalf or on behalf of Iron Workers Local 451 ever committed a trespass of any kind at Julian's job site or caused any damage to Julian's equipment or acted in any way or with anyone else to terminate Julian's subcontract with Raytheon or participated in any picket line or other action of any other person or union or organization at Julian's job site.

7. On November 8, 1978, I attended a meeting with a representative of the Delaware Solid Waste Authority and others solely for the purpose of obtaining information. At that meeting, I did not express my view about Julian's subcontract with Raytheon or Julian's work on the project and did not indicate in any way that I or Iron Workers Local 451 had taken, was taking, or intended to take any action in opposition thereto. Neither I nor anyone else acting on my behalf or on behalf of Iron Workers Local 451 attended a meeting on November 29, 1978, or on any other date.

Affidavit of Edward F. Peterson, at ¶¶ 4-7, annexed to Dkt. No. 112.

**9.** At this juncture only the Sherman Act count will be discussed because the basis for the other two counts—violation of section 303 of the LMRA and state tort law violations—are based upon the same incidents which allegedly support the Sherman Act count. These two claims are discussed *infra* but, since the validity of all three claims inextricably involves the existence of a conspiracy, discussion of the Sherman Act count will be controlling.

incidents are: first, Peterson's attendance as the representative of the Iron Workers at a November 8, 1978 meeting between the Authority, the Trades Council and Raytheon; second, Peterson's attendance and statements at a July 5, 1979 meeting of the Trades Council; and third, participation in October 1979 picketing by members of the Iron Workers. Plaintiff submits various documentary exhibits and deposition testimony which support these three events. Moving defendants assert first, that all of plaintiff's documentary evidence is inadmissible; [10] and second, that these items, even if assumed admissible, do not constitute knowing participation in a conspiracy and therefore, summary judgment in their favor should be granted.

 The evidentiary concerns, despite exhaustive briefing by the parties, are largely obviated because admissions in the Peterson affidavit and evidence that is either clearly admissible or not objected to adequately support a finding of the existence of a material fact at issue regarding the conspiracy count.[11] The ensuing section expands upon the basis for this finding.

## II. The Standard as Applied to this Case

As noted, on November 8, 1978 a meeting was held among representatives of all defendants—including the moving defendants. Mr. Peterson admits attending the meeting but the moving defendants object to the introduction of documentary evidence relating to certain statements made at the meeting by various participants. No statements are attributed to Mr. Peterson. Plaintiff alleges that the conspiracy was hatched at this meeting, and as attendees, moving defendants were knowing participants.[12] Moving defendants do not dispute that the participants discussed proposed action to remove Julian from the project. Rather, Mr. Peterson's affidavit simply states "I did not express any view about Julian's subcontract with Raytheon or Julian's work on the project and did not indi-

10. Rule 56 and the case law construing the rule establish beyond peradventure that a court may consider only evidence admissible under the Federal Rules of Evidence in its disposition of a summary judgment motion. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F.Supp. 1125, 1139 (E.D.Pa.1980).

11. It is apparent that several pieces of documentary evidence are clearly inadmissible and substantial questions concerning the admissibility of others exist. As noted, these thorny questions need not be reached because one *document placed before the Court in support of* plaintiff's summary judgment motion, but referring to another evidentiary fact, clearly supports the salient factual issue—participation in picketing. *See infra* discussion at 1066–1067. This document, Exhibit P–93, was referenced as supporting plaintiff's contention. Moving defendants, rather than attack the admissibility of the document, simply allege "[t]hat exhibit never was argued by Julian in its answering brief." Letter of Harvey B. Rubenstein, Esq., to Hon. Murray M. Schwartz, at 4 (December 3, 1982). Despite the factual inaccuracy, *see* Plaintiff's Answering Brief, Dkt. No. 116, at 14 (citing Exhibit P–93 *but* in support of Oct. 23 picketing rather than Oct. 22), the document clearly is before the Court and, in the absence of an objection, may be considered. *Cf.* Fed.R. Evid. 103(a)(1) (requirement of timely objection). While Exhibit P–93 might constitute hearsay, it appears admissible under Fed.R. Evid. 803(6). In addition, the document, since generated by a party opponent, may constitute an admission and thus non-hearsay pursuant to Fed.R.Evid. 801(d). Much of the documentary evidence raises interesting double hearsay problems in that the document itself might be admissible against the generator of the document as an admission pursuant to Fed.R.Evid. 801(d)(2)(A), (C), & (D) but the document may contain internal hearsay relating to the moving defendants. *See* Fed.R.Evid. 805. Such internal statements, however, may be non-hearsay as an admission or may fall within one of the enumerated hearsay exceptions in Fed.R.Civ.P. 803 & 804. If independent and admissible evidence establishes, by a preponderance of the evidence that a conspiracy exists, all of the documents may be considered the admissions of a co-conspirator and thereby admissible against the moving defendants. Fed.R.Evid. 801(d)(2)(E). The document may be admitted conditionally until an independent showing of conspiracy is made. Fed.R.Evid. 104(b).

12. Plaintiff submits the following exhibits in support of its allegation: Exhibit P–10 (handwritten notes of meeting); Exhibit P–22 (trip report by R.J. Storella); Exhibit P–122 (affidavit of N.C. Vasuki submitted to NLRB). Defendant objects to the admissibility to each of these documents. As noted, no opinion is expressed regarding the evidentiary contentions of the parties.

cate in any way that I or Iron Workers Local 451 had taken, was taking, or intended to take any action in opposition thereto." *See supra* note 8, ¶ 7.

Julian also presents an abstract of the minutes of a July 5, 1979 meeting of the Trades Council,[13] in which Mr. Peterson allegedly referred to the Project and expressed dismay over the cooperation received by the Trades Council in Washington with "this problem." While one might surmise that the "problem" concerns conspiratorial machinations to remove Julian—an inference plaintiff propounds as a tautology—nothing currently in the record supports such an inference. The term "problem" could conceivably relate to a plethora of wholly unrelated concerns such as union animosity and jurisdictional differences relating to Local 15253. It is significant, however, that the Peterson affidavit contains no specific reference to the meeting either disavowing the statement or asserting non-attendance. Peterson simply asserts that, other than the November 9, 1978 meeting, he never "attended a meeting on November 29, 1978, or on any other date." *See supra* note 8, ¶ 7.[14] One deposition in the record establishes the existence of and Peterson's attendance at a meeting held on July 5, 1979. Deposition of Frank F. Di-Mauro, 51–5. While attendance, without more, is insufficient to establish the participation in a conspiracy, *see infra,* the dispute over whether Peterson attended the July 5

meeting is relevant to knowing participation when coupled with the October picketing.

Finally, Julian points to picketing of the job site—at Raymond's gate—on October 17, 18 and 22, 1979 by individuals with signs identifying them as affiliated with the Iron Workers.[15] At oral argument on the present motion, Julian's counsel conceded that the picketing was the most salient fact which justified suit against the moving defendants.[16]

In sum, admissible evidence supports Julian's contention that the Iron Workers participated in picketing in October of 1979 and that moving defendants attended meetings on November 8, 1978 and July 5, 1979. For the reasons that follow, looking at the evidence in the light most favorable to Julian, these three components satisfy the requirement that probative evidence exists of a material fact at issue. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *cf. Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (summary judgment inappropriate where credibility of witnesses at issue).

While mere membership in an unincorporated trade association, including attendance at meetings, will not give rise to an inference of conspiracy,[17] proof of know-

---

13. Plaintiff's Exhibit P–126–5, annexed to Dkt. No. 116.

14. Julian places considerable emphasis on a November 29, 1978 meeting among the Trades Council, Raytheon and RSC with regard to the conspiracy but no evidence links the moving defendants to this meeting.

15. Julian submits a diary in support of the factual allegation that pickets were established by the Iron Workers. Plaintiff's Exhibit R–34, annexed to Dkt. No. 116. Defendant challenges the admissibility and plaintiff asserts that the diary constitutes either an admission and hence is non-hearsay, or is a business record and hence is covered by the exception in Fed.R.Evid. 803(6). Since other evidence is before the Court verifying Iron Worker's participation in picketing, specifically Exhibit P–93, annexed to Dkt. No. 116, the objection is irrelevant. *See supra* note 11.

16. Counsel made a half-hearted effort to assert that the attendance at the July 5th meeting and the statements attributed to Peterson justified the suit but indicated that but for the picketing, it would not have brought suit against moving defendants. In fact, the linkage to the picketing distinguishes the moving defendants from the other union attendees of the November 8, 1978 meeting who have not been named as defendants.

17. *See e.g., Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. at 1149; *Trist v. First Federal Sav. & Loan Ass'n,* 466 F.Supp. 578, 587 (E.D.Pa. 1979).

ing, intentional participation in illegal activities of members of the trade association will support a Sherman Act cause of action. *See Zenith Radio Corporation v. Matsushita Electric Industrial Co.,* 513 F.Supp. 1100, 1149 (E.D.Pa.1981). This standard of knowing participation, however, falls far short of the onerous burden moving defendants seek to erect. Knowing participation may occur when members tacitly or expressly ratify the known illegal actions of the association or individual members. *See Vandervelde v. Put and Call Brokers and Dealers Ass'n,* 344 F.Supp. 118, 155 (S.D.N.Y.1972).[18]

■ This construction logically follows from the very nature of a conspiracy action. The existence of such a conspiracy generally is not conducive of direct proof. Rather, conspiracies seldom are established by more than circumstantial evidence. *See United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1261 (1948); *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Plaintiff must provide significant probative evidence that defendants had a "conscious commitment to a common scheme" in order to infer the existence of a conspiracy from circumstantial evidence. *See First National Bank of Arizona v. Cities Services, Co.,* 391 U.S. at 287–88, 88 S.Ct. at 1591–92; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). In this case, the act of picketing, when coupled with attendance at the November 8, 1978 meeting where unlawful actions were discussed,[19] adequately links moving defendants with the unlawful purpose. *Cf. United States v. Magnano,* 543 F.2d 431, 434–45 (2d Cir.1976) (participation in single transaction coupled with knowledge of broader motives sufficient to raise infer-

ence of criminal conspiracy), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977).

■ The Court recognizes the burden placed upon the moving defendants by denial of their motion for summary judgment. Nonetheless, moving defendants seek to literally place the cart before the horse by propounding the argument that the high cost of litigation coupled with scanty evidence justifies the grant of summary judgment in their favor. Such a standard is inapplicable in the current context. Julian conclusively has demonstrated participation in picketing and attendance at meetings. The existence of a conspiracy is very much at issue and this case should go to a jury. While Julian may not ultimately prevail against moving defendants, it is not the province of this Court, at this juncture, to deprive it of the right to proceed. Julian has already demonstrated restraint by not bringing suit against every attendee at the relevant meetings. Furthermore, Julian is not proceeding on mere speculation. Moving defendants' reliance upon Judge Becker's decision in *Zenith* is misplaced for this very reason. Summary judgment is appropriate in an antitrust context to ferret out those defendants as to which evidence does not support an inference of knowing participation. Such is not the case at bar. As Judge Becker recognized, the test in a conspiracy case concerns neither proof of overt action nor formal agreement, but rather the existence of an unlawful agreement. *Zenith,* 513 F.Supp. at 1165. As the United States Court of Appeals for the Third Circuit stated:

To establish the existence of concerted actions, appellants had to submit evidence from which a jury could reasonably infer that [defendants] and others had a con-

---

**18.** While mere membership, even when coupled with knowledge of wrongful conduct of the association, is insufficient to establish knowing participation, *Hunt v. Mobil Oil Co.,* 465 F.Supp. 195, 231 (S.D.N.Y.1978), *aff'd mem.,* 610 F.2d 806 (2d Cir.1979), once attendance is coupled with a consistent later act, an inference of knowing participation is permissible.

**19.** Mr. Peterson does not deny such a discussion occurred, his affidavit only states a general disavowal of such action on the part of moving defendants. Thus, contrary to defendants' characterization, there has been no specific denial of knowledge.

scious commitment to a common scheme designed to achieve an unlawful objective.

*Edward J. Sweeney & Sons v. Texaco, Inc.,* 637 F.2d at 110–11. On the evidence currently before the Court, such an inference is reasonable.

### III. Julian's Section 303 Claim

Julian alleges that the moving defendants violated section 303 of the LMRA by forcing subcontractors to cease doing business with Julian thereby resulting in Raytheon terminating Julian's subcontract. Moving defendants assert that the three incidents of picketing in October of 1979 constitute the only evidence in support of this claim, and, without citation to authority, assert such picketing factually fails to constitute a violation of section 303.[20] That section authorizes suits for damages by persons injured in their business or property by labor organizations which engage in unfair labor practices in contravention of section 8(b)(4) of the National Labor Relations Act. 29 U.S.C. § 158(b)(4).[21]

Moving defendants note that Julian's evidence shows that Iron Workers picketing occurred on "only" three days, October 17,

1979, October 18, 1979 and October 22, 1979. This, they allege, fails to constitute evidence that the Iron Workers "threatened, coerced or restrained Raytheon and RSC to cease doing business with Julian." Moving Defendants' Opening Brief, Dkt. No. 112, at 9. Rather, urge moving defendants, any pickets had legitimate independent goals, unrelated to any desire to remove Julian from the project.

The Court cannot agree with this characterization. As noted previously, moving defendants attended meetings where it is alleged that the conspiracy was hatched and nurtured and, more significantly, acted consistently with the announced position of other defendants by picketing. In addition, Julian alleges that when it filed an unfair labor practice complaint with the NLRB, the pickets were removed and immediately replaced by Trades Council members. Dkt. No. 116, at 33 (Julian's Reply Brief); *see also* Exhibits P–93, P–96 at 2, annexed to Dkt. No. 116. These facts cannot be ignored.[22] Furthermore, what might facially appear as a legitimate picket line may well have illegitimate, secondary motives. *See Bexar Plumbing Co., Inc. v. NLRB,* 536 F.2d 634,

**20.** Section 303 provides, in relevant part:

(a) It shall be unlawful ... for any organization to engage in any activity or conduct defined as an unfair labor practice....

(b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefore in any district court ... and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187.

**21.** Such activities are defined as follows:

It shall be an unfair labor practice for a labor organization or its agents ... (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment ... to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—(A) forcing or requiring any employer ... to enter into any agreement which is prohibited by subsection (e) of this section; (B) forcing or requiring any person to cease using, selling,

handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees.

29 U.S.C. § 158(b)(4).

**22.** Peterson's affidavit, containing a categorical denial of conspiratorial motives and a denial of participation in "a picket line or other acts of any other person or union," *see supra* note 8, ¶ 6, at best raises a material issue of fact regarding its meaning and its veracity. The affidavit is directly controverted as to participating in picketing by admissible evidence. *See* Exhibit P–93, annexed to Dkt. No. 116. Furthermore, upon closer scrutiny, the carefully drafted Peterson affidavit is susceptible to at least two readings: first, that moving defendant did not picket; and second, that they did not join another's picket. The former reading is strained and, as such, no specific denial of participation in picketing is evident.

636 (5th Cir.1976); *NLRB v. Local 327, Plumbers United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (AFL–CIO),* 469 F.2d 403, 408 (7th Cir.1972).[23] The current factual scenario neatly fits within these cases—despite avowed legitimate goals of picketing, substantial evidence supports an inference that the real goal was the preclusion of Julian. As such, summary judgment is inappropriate.

### IV. Julian's Pendent State Claim

Count VI of the Complaint alleges damages for violent trespass giving rise to a state law tort claim. It must first be noted that the Peterson affidavit specifically denies participation by moving defendants in any trespass. *See supra* note 8, ¶ 6. Julian has failed to provide any evidence to the contrary. Instead, Julian alleges that moving defendants are liable for the torts of their co-conspirators.[24]

Without challenging the legal underpinnings of this statement, moving defendants simply state that the record contains no factual support for the allegation. For the reasons stated above, moving defendants' positions cannot be adopted. While Julian submits a diary (Exhibit R–34) in support of its contention of violence, and moving defendants attack its admissibility, Exhibit P–93 states that on October 24, 1979 "[t]railers of KCI, RSC, Julian and Bechtel were rolled-over by pickets." Since there is no objection to this exhibit, the Court considers it appropriate to find the existence of a material question of fact regarding whether violent trespass occurred.

One further comment with respect to this particular count is appropriate because the complaint is far from a paragon of clarity. Julian argues that moving defendants are also responsible for damages to their business on the theory of tortious interference of business relations. Such a claim is contained in Count IV of the complaint, which fails to name the moving defendants. In contrast, Count VI, which does name the moving defendants, seeks damages for violent trespass. Nonetheless, Count VI "incorporates by reference the averments of Paragraphs 1 through 89 of this complaint" and paragraph 89 contains the allegation or tortious interference. Whether a claim for tortious interference with business relations has been properly raised against moving defendants is unclear from the complaint.

### V. Conclusion

In summary, the gravamen of Julian's claims against the moving defendants revolves around the existence of and knowing participation in a conspiracy to remove Julian. Absent significant probative evidence of this element, all claims against moving defendants must fall. Such evidence, however, exists; therefore, summary judgment will be denied.

---

**23.** The relevant issue in a section 303 case is the union's objective rather than the effect of picketing. If an object was illegal, the claim is well-founded. *Bexar,* 536 F.2d at 635; *see Pickens-Bonds Const. Co. v. United Bhd. of Carpenters and Joiners of Amer., Local 690,* 586 F.2d 1234, 1239–41 (8th Cir.1978).

**24.** Courts in Delaware recognize that "co-conspirators are jointly and severally liable for the acts of their confederates committed in furtherance of the conspiracy." *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 170 (Del.1976).