**SUNSHINE BOOKS, LTD., Appellant,**

**v.**

**TEMPLE UNIVERSITY, of the Commonwealth System of Higher Education, Appellee.**

**No. 81–3129.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1982.

Decided Dec. 28, 1982.

Scott D. Patterson (argued), Saul, Ewing, Remick & Saul, Philadelphia, Pa., for appellant.

Matthew M. Strickler (argued), Michael L. Lehr, Geoffrey A. Kahn, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellee.

Before ADAMS, HUNTER and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Price competition in the retail sale of undergraduate textbooks at Temple University prompted this antitrust suit by appellant Sunshine Books, Ltd. ("Sunshine"), against appellee Temple University ("Temple"). Temple has long operated a student bookstore (the "Bookstore"); Sunshine sells student textbooks from a truck or trailer parked on the street near the Bookstore. Complaining that the Bookstore's one-week "manager's special" on fifty undergraduate textbook titles (offered at fifteen percent off suggested retail price) represented an attempt by Temple to monopolize the sale of undergraduate course textbooks to students at the University by means of predatory pricing, Sunshine brought this action against Temple under Section 2 of the Sherman Act,[1] 15 U.S.C. § 2 (1976).[2]

Temple moved for summary judgment on the ground that its discounted prices were above average variable cost and, therefore, were presumptively not predatory. The district court allowed a brief period of discovery limited to issues raised by the motion. Then, relying exclusively on the Areeda-Turner definition of predatory pricing,[3] the court concluded that there were no genuine issues of material fact and that Temple had not priced the books sold during the "manager's special" below marginal or average variable cost; it therefore granted summary judgment for Temple. *Sunshine Books, Ltd. v. Temple University,* 524 F.Supp. 479, 481, 483–484 (E.D.Pa.1981).

Although this Court has reserved the question whether the Areeda-Turner standard represents the appropriate definition of predatory pricing, *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 352 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982), we need not reach that question here, for we find the existence of a genuine issue of material fact even within the Areeda-Turner framework. We therefore will vacate the decision below and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Temple University operates five bookstores; the one whose practices are at issue here is located at the University's main campus in North Philadelphia.[4] That store carries each of the approximately 3,800 textbook titles used each semester in Temple's undergraduate and graduate courses and also stocks clothing, gifts, greeting cards, newspapers, magazines, and other publications of general interest.

In January 1979, Sunshine began to sell various school supplies and some graduate and undergraduate textbooks, at approximately ten percent off suggested retail prices, from a truck or trailer parked near

---

1. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

    15 U.S.C. § 2 (1976).

2. A second count was based on the Pennsylvania Unfair Sales Act, Pa.Stat.Ann. tit. 73, § 213 (Purdon 1971).

3. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). For a case employing Areeda-Turner methodology, see *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 723–24 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

4. Unless otherwise noted, the facts recited in this opinion are undisputed.

Temple's Bookstore.[5] This enterprise, which continued only for the first two or three weeks of the semester, was repeated at the beginning of subsequent semesters.

The events that triggered the present suit began on the first day of Temple's Fall 1980 term, when the Bookstore ran a one-week "manager's special," offering fifty undergraduate textbook titles at fifteen percent below their suggested retail prices. The only titles discounted, with two or three exceptions, were those also sold by Sunshine. Upon hearing of the "manager's special," Sunshine posted the Bookstore's prices on its trailer and undercut those prices by an additional twenty-five cents. Sunshine then brought this action, alleging that Temple had attempted to monopolize the sale of undergraduate textbooks to students at the University by means of predatory pricing. Sunshine predicated its Sherman-Act claim essentially on the allegation that Temple had priced the books sold during the "manager's special" below cost, thereby forcing Sunshine to sell its own books below cost in order to compete.[6]

Temple moved to dismiss or, in the alternative, for summary judgment, relying solely on its assertion that it had not sold the textbooks below cost and therefore could not have violated the Sherman Act. The district court allowed discovery on the cost issue and then granted Temple's motion.[7]

## II. APPLICABLE LEGAL PRINCIPLES

■ This Court hardly needs to reiterate that the purpose of the Sherman Act always has been to promote vigorous competition. *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 689, 95 S.Ct. 2598, 2614, 45 L.Ed.2d 463 (1975). Congress envisioned that rival sellers, seeking to enlarge their market shares, would lower prices in order to woo buyers from competing merchants. Such price competition undeniably would injure some sellers but also would improve the lot of consumers. Thus, "[t]he antitrust laws ... protect competition, not competitors; and stiff competition is encouraged, not condemned." *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973).

■ At the same time, prices that are calculated to destroy, rather than reflect, competition do not comport with the Act's purposes. "A firm which drives out or excludes rivals by selling at unremunerative prices is not competing on the merits, but engaging in behavior that may properly be called predatory." 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 711, at 150 (1978). Firms engage in such conduct with the intent of " 'foregoing present profits in order to create a market position in which [they] could charge enough to obtain supra-normal profits and recoup [their] present losses.' " *O. Hommel Co. v. Ferro Corp., supra,* 659 F.2d at 348 (quoting *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)). Thus, a court confronted with an allegation of predatory pricing, as in this case, must determine whether the defendant in fact had been selling at "unremunerative prices," or below cost.

■ Before it can make such a determination, the court must decide precisely what constitutes the "cost" against which the price is to be measured. Professors Areeda and Turner have advanced the theory that only those prices below marginal cost or

---

5.  Sunshine also sold books at four other locations.

6.  In argument before this Court, Sunshine contended that a price-based approach is not the sole way that it can make out a claim under § 2 of the Sherman Act. Moreover, Sunshine's brief cites this Court's utterance that "[p]redatory intent can be shown by *two* means: (a) by express evidence; and (b) by inference from 'below-cost' pricing." *O. Hommel Co. v. Ferro*

*Corp., supra,* 659 F.2d at 347 (emphasis added). However, no record was developed in the district court to support this alternative approach. The viability of Sunshine's contention will be a matter for that court on remand.

7.  Having granted summary judgment on the Sherman-Act count of the complaint, the court then declined to exercise pendent jurisdiction over the state-law claim.

average variable cost[8] imply the existence of the kind of predatory pricing that offends the Sherman Act,[9] Areeda & Turner, *supra* note 3, at 716, and a number of courts have employed the Areeda-Turner analysis or in some degree adopted the Areeda-Turner prescription, *see, e.g., Northeastern Telephone Co. v. American Telephone and Telegraph Co., supra* note 9, 651 F.2d at 88 (agreeing with Areeda and Turner "in the general case at least"); *International Air Industries, Inc. v. American Excelsior Co., supra* note 3, 517 F.2d at 723–24; *Weber v. Wynne,* 431 F.Supp. 1048, 1059–60 (D.N.J. 1977); *cf.* Monroe & Hill, *The Predatory Pricing Controversy: Academic Theories Enter the Courtroom,* 13 U.Tol.L.Rev. 539, 542–46 (1982) (discussing judicial treatment of Areeda-Turner and other cost-based tests). *But see D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.,* 43 Antitrust & Trade Reg.Rep. (BNA) 893 (9th Cir. Nov. 2, 1982) ("This circuit has chosen not to adopt the simple Areeda and Turner formula."). The district court also adopted the Areeda-Turner analysis in this case and concluded that only those prices below average variable cost could be shown to be predatory.[10] *Sunshine Books, Ltd. v. Temple University, supra,* at 481. For purposes of this appeal, we shall assume, without

**8.** A firm's economic costs may be divided into two categories: "fixed" and "variable." "Fixed" costs do not vary with output; they are costs that would continue even if the firm produced nothing at all. "Variable" costs, on the other hand, do vary with changes in output. "Average variable cost" is the sum of all variable costs divided by output, and "marginal cost" represents the increment to total cost resulting from the production of an additional increment of output. Areeda & Turner, *supra* note 3, at 700.

Professors Areeda and Turner conclude that "marginal-cost pricing is the economically sound division between acceptable, competitive behavior and 'below-cost' predation." *Id.* at 716. However, they recognize that a marginal-cost standard inevitably clashes with "the difficulty of ascertaining a firm's marginal cost. The incremental cost of making and selling the last unit cannot readily be inferred from conventional business accounts, which typically go no further than showing observed average variable cost." *Id.* Consequently, Areeda and Turner acknowledge the need to use average variable cost as a surrogate for, or "indicator" of marginal cost.

**9.** Predatory pricing generally implicates the Sherman Act's prohibition against attempted monopolization, 15 U.S.C. § 2 (1976). This Court has held that "two essential elements of a § 2 attempt to monopolize violation are a specific intent to monopolize the relevant market and sufficient market power to come dangerously close to success." *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1079 (3d Cir.1978). Under *Swift & Co. v. United States,* 196 U.S. 375, 396, 402, 25 S.Ct. 276, 281, 49 L.Ed. 518 (1905), attempted monopolization, like any other form of criminal "attempt," also requires the existence of an act related in some way to the attempt. *Cf. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir.1981) (three elements of an attempt claim are specific anticompetitive intent, "predatory or anticompetitive conduct directed to accomplishing the unlawful purpose," and dangerous probability of success); *Northeastern Telephone Co. v. American Telephone and Telegraph Co.,* 651 F.2d 76, 85 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 s.Ct. 1438, 71 L.Ed.2d 654 (1982) ("Anticompetitive or exclusionary conduct is unquestionably a necessary element of a § 2 attempt."); *Keco Industries, Inc. v. Borg-Warner Corp.,* 334 F.Supp. 1240, 1245 (M.D.Pa.1971) (attempted monopolization requires " 'dangerous probability' of a monopoly . . . together with overt acts committed in furtherance thereof" with specific intent of achieving unlawful goal); 3 P. Areeda & D. Turner, *supra,* ¶ 820, at 312 ("classic formulation" of attempted monopolization involves presence of intent, conduct, and dangerous probability of achieving monopoly power). The Areeda-Turner standard comprehends the notion that pricing below average variable cost demonstrates the requisite intent and conduct.

The most recent Third Circuit formulation of the elements of attempted monopolization, *see Friedman, supra,* does not expressly mention conduct, in contrast to the formulae propounded by Professors Areeda and Turner, *supra,* and enunciated in *Inglis* and *Northeastern Telephone, supra.* Although such a requisite would seem to be implicit in the *Friedman* test, we need not here engage in the exercise of reformulation, as the parties and the district court all appear to have assumed that evidence of conduct is in fact required.

**10.** Professors Areeda and Turner also take the position that prices below average variable cost "should be *conclusively* presumed unlawful." Areeda & Turner, *supra* note 3, at 733 (emphasis added). Under this approach, Temple would have no defense to the claim of predation if Sunshine could show that the Bookstore had priced below average variable cost. We intimate no views on this matter.

deciding, the correctness of the district court's position that the average-variable-cost standard offers the preferred way to approach a claim of predatory pricing.[11] *Cf. O. Hommel Co. v. Ferro Corp., supra,* 659 F.2d at 352 (declining to declare adherence to Areeda-Turner thesis "or any other economic theory proposed").

## III. DISPUTED ALLOCATIONS OF COST: IS THERE A GENUINE ISSUE OF MATERIAL FACT?

Adhering to the precepts of Areeda-Turner analysis, the district court examined the accounting evidence submitted by the parties and compared Temple's revenues with its incurred costs in order to determine whether the fifteen-percent-off "manager's special" resulted in sales of textbooks below average variable cost. Total sales of the fifty titles included in the "manager's special" amounted to $118,427.85, with an invoice price of $108,012.40. Temple's gross margin was thus $10,415.45. The district court further reduced this margin to $6,720.70 by deducting several other expenditures that either were undisputed or were resolved in accordance with the figures offered by Sunshine: freight-in charges of $2,134.65; freight charges for returned books of $1,056.82; bad-check expenses of $355.28; and handbill printing costs of $148.

The dispute in this case focused on the payroll expenses and the amount—if any— that should be allocated for "inventory shrinkage" (i.e., theft). The district court determined that Temple's payroll expenses in connection with the sale were $3,787.97 but that the cost of theft should not be considered a variable cost. Subtracting $3,787.97 from $6,720.70, the court found that Temple had received a return of $2,932.73 above variable cost and therefore

had not engaged in predatory pricing. Sunshine, however, argues that the "manager's special" cost Temple $7,839.19 in payroll expenses and that a 2.9 percent inventory-shrinkage charge (amounting to $3,434.41) also should have been included as a variable cost; acceptance of either or both of Sunshine's figures would reduce Temple's return below average variable cost—a result that Areeda-Turner analysis would consider predatory. Temple, for its part, presents a third set of figures: Temple agrees with the district court that inventory shrinkage is not a variable cost but asserts that the court *overstated* the payroll expenses by $902.97. Temple therefore claims to have earned a return above average variable cost even more significant than that found by the district court.

Sunshine and Temple employ different accounting methods to produce their respective results. Sunshine seeks to ascribe wages and salaries to the one-week "manager's special" by allocating payroll expenses in proportion to sales: "if X% of Bookstore sales during the allocable period were Manager's Special sales, X% of Bookstore payroll should be borne by those revenues." Brief for Appellant at 17. This approach may be termed a "sales-based" allocation. Temple, by contrast, argues for a "unit-based," or "per-volume," approach, which involves dividing the Bookstore's textbook-related payroll costs for approximately two months prior to the sale among each volume ordered, priced, and shelved during that period; Temple then multiplies the per-volume figure by the number of volumes sold during the "manager's special." The district court accepted Temple's approach, though it adjusted Temple's figures by increasing the amount of the store manager's labor allocable to the sale and by including payroll cost attributable to books returned as unsold after the one-week "manager's special."

---

11. The Areeda-Turner formulation has been the subject of extensive scholarly commentary. *See, e.g.,* R. Bork, *The Antitrust Paradox—A Policy at War with Itself* 148–55 (1978); R. Posner, *Antitrust Law—An Economic Perspective* 191–93 (1976); L. Sullivan, *Handbook of the Law of Antitrust* § 43, at 109–10 (1977); Baumol, *Quasi-Permanence of Price Reduc-* tions: *A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1 (1979); Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213 (1979); Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869 (1976); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284 (1977).

The question of inventory shrinkage presents additional accounting problems. Temple estimated its revenues by calculating how many of the books it had ordered no longer remained in inventory. This method assumes that revenues were generated by all books no longer in stock, but Temple could not demonstrate that each of those books actually had been sold, rather than mislaid or stolen. Sunshine therefore contends that basic accounting principles require some kind of adjustment (Sunshine suggests $3,434.41) to average variable cost for inventory shrinkage and that revenues should be reduced to account for books that "merely vanished." Inventory shrinkage cannot be considered a fixed cost, claims Sunshine, because no theft ever would occur were Temple to cease selling books (its "output"); moreover, Sunshine argues, "fewer items in a store also means fewer things to steal." Brief of Appellant at 15.[12]

Temple disputes Sunshine's argument and has submitted an affidavit of John P. Cassel, Jr., Temple's Director of Student Stores, stating: "In 1974–75, $1,506,852 worth of textbooks were sold and there was shrinkage of 5.7%; in 1978–79, $1,791,193 worth of textbooks were sold and the shrinkage was 2.9%." Cassel Supp. Aff. at ¶ 12. The court accepted this affidavit as conclusive evidence that increased sales do not necessarily generate increased theft and refused to factor inventory shrinkage into its calculations of variable cost.

In sum, Sunshine first asserts that payroll costs during the period of alleged predation must be divided in accordance with dollar sales of that period; Temple chooses to allocate such costs according to a per-volume, unit-based method. Second, Sunshine contends that inventory shrinkage, through theft or otherwise, must be considered in computing average variable cost; Temple argues that theft does not vary with sales and thus is not a variable cost. Acceptance of either or both of Sunshine's approaches (and figures) would have raised Temple's average variable costs above its prices. The trial court thus was faced with a two-fold dispute over how much it actually cost Temple to run the "manager's special."

This Court recently has summarized the standards for summary judgment:

> Rule 56 of the Federal Rules of Civil Procedure provides that a trial court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We have characterized summary judgment as " 'a drastic remedy' ", and have made clear "that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties." *Ness v. Marshall,* 660 F.2d 517 at 519 (3d Cir. 1981) (quoting *Tomalewski v. State Farm Life Insurance Co.,* 494 F.2d 882, 884 (3d Cir.1974)). Moreover, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "On review the appellate court is required to apply the same test the district court should have utilized initially." *Id.*

*Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981).

To support its contention that a sales-based allocation of payroll expenses is necessary, Sunshine cites Welsch & Anthony, *Fundamentals of Financial Accounting* 69 (3d ed. 1981), for the proposition that all costs ultimately must be recognized and matched to revenues. *See* Plaintiff's Final Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Final Memorandum") at 16. Sunshine also has submitted affidavits of its President, Marc J. Falkowitz, who asserts that "[t]he 'matching principle' of cost accounting,

---

**12.** Sunshine actually does not label inventory shrinkage a "cost" but, rather, "a correction of revenue data . . . , although it has its roots in a true cost—theft." Brief of Appellant at 12.

with which I am familiar, requires costs to be matched as closely as possible with the *revenues* with which they are connected." Falkowitz Supp. Aff. at ¶ 4 (emphasis added).

Falkowitz refers to Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment ("Supplemental Response"), which contains four alternative methods of calculating payroll expenses as a function of revenue, Supplemental Response at 10–14, and declares that, "[b]ased on my accounting training and bookselling experience," the alternative assumptions are all "reasonable." Falkowitz Supp. Aff. at ¶ 6. He adds that a combination of two of those assumptions, *see* Supplemental Response at 13, is "the most reasonable of all," Falkowitz Supp. Aff. at ¶ 6. Finally, Falkowitz refers to Temple's document "Estimated Cost of Selling a Text Book for the Past Fall Rush," which calculates cost on a per-volume basis, and labels the study "totally unrealistic and without any value as a method of determining allocable payroll expense. It assumes perfect efficiency and would result in the cost of unproductive employee time being imposed entirely on cost centers other than textbooks." Falkowitz Supp. Aff. at ¶ 7. Thus, the district court had before it more than one method of allocating the Bookstore's payroll expenses as well as Sunshine's critique of Temple's approach.

On the issue of inventory shrinkage, Sunshine again refers to Welsch & Anthony's conclusion that a "periodic inventory" system such as Temple's must be adjusted on a percentage basis to account for discrepancies between actual dollar revenues and revenues calculated from inventory changes, Final Memorandum at 3–4, as well as to the very broad Areeda-Turner definition of "variable cost," which would appear to include inventory shrinkage, Supplemental Response at 5 (quoting 3 P. Areeda & D. Turner, *supra*, ¶ 715c, at 173–74). Moreover, Falkowitz, in his affidavit, describes

shoplifting as a cost of selling books, Falkowitz Supp. Aff. at ¶ 3, and asserts that, "[b]ased on my general knowledge of university bookstore loss rates, and my particular knowledge of Temple's location and poor security," an inventory-shrinkage estimate of one percent would be "quite conservative," *id.* at ¶ 8.

▪ Fed.R.Civ.P. 56(e) makes it clear that "an adverse party may not rest upon the mere allegations or denials of his pleading" in opposition to a properly supported summary-judgment motion. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). "When faced with defendant['s] sworn denial of the existence of [a Sherman-Act violation], it is incumbent upon the plaintiff to produce significant probative evidence demonstrating that a genuine issue of fact exists as to this element of the complaint." *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 554 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *see also Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir.1975); *Boulware v. Parker,* 457 F.2d 450, 452 (3d Cir.1972).

▪ Given this standard for summary judgment, we believe that Sunshine's submissions on the question of payroll allocation suffice to create a genuine issue of material fact with respect to Temple's cost and thus to withstand Temple's motion for summary judgment even in the face of the Cassel affidavits and the legal arguments proffered by Temple.[13] We note in this regard that several courts have rejected summary judgment as a means of deciding questions about the validity of conflicting methods of accounting. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc., supra* note 9, 668 F.2d at 1038 (determination of fixed and variable costs is matter for jury); *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496

---

**13.** Although Sunshine also makes a forceful argument that the district court improperly resolved the inventory-shrinkage question, we need not reach that matter here; Sunshine will have an opportunity on remand to advance evidentiary support for its inventory-shrinkage contention as well.

F.2d 391, 397–98 (4th Cir.1974) (denying summary judgment in predatory-pricing case involving dispute about accuracy of methods of cost accounting); *In re IBM Peripheral EDP Devices Antitrust Litigation,* 459 F.Supp. 626, 631 (N.D.Cal.1978) ("Whether one method of accounting for costs actually incurred or another is proper is essentially a question of fact, and thus is not a proper subject for summary judgment."). We agree.

Because we find that the record presents a genuine issue of material fact, we will vacate the judgment of the district court and remand for further proceedings.