**JAMES JULIAN, INC., Plaintiff,**

v.

**RAYTHEON COMPANY, et al., Defendants.**

**Civ. A. No. 80–30 MMS.**

United States District Court, D. Delaware.

Aug. 31, 1984.

---

John Van Brunt, Jr., Wilmington, Del., for plaintiff.

Robert Burton Coonin, Wilmington, Del., Berkowitz, Greenstein, Schagrin & Coonin, P.A., Wilmington, Del. (Martin Wald, Schnader, Harrison, Segal & Lewis, Philadelphia, of counsel), for defendants Operating Engineers Local No. 542 and Spanich.

Clifford B. Hearn, Wilmington, Del. (William J. Einhorn, Sagot & Jennings, Philadelphia, of counsel), for defendant Wharf & Dock Builders Local 454.

Harvey B. Rubenstein, Wilmington, Del., for defendants Ironworkers No. 451 and Peterson.

Joseph Benson, Wilmington, Del. (Richard B. Sigmond, Mernaze, Katz, Spear & Wilderman, Philadelphia, of counsel), for defendants Building Trades Council of Delaware & DiMauro.

OPINION

MURRAY M. SCHWARTZ, District Judge.

James Julian, Inc. ("Julian"), a construction contractor, brought this action to obtain relief from various union, non-union, and individual defendants under sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2), under section 303 of the Labor Management Relations Act (29 U.S.C. § 187) and under state tort law. The non-union defendants, Raytheon Company ("Raytheon") and Raytheon Service Company ("RSC"),[1] reached a settlement with Julian and have been dismissed from the action.[2] The remaining union defendants are: Building and Construction Trades Council of Delaware ("Trades Council") and its President, Frank E. DiMauro, Operating Engineers Local 542 ("Operating Engineers") and its agent Albert W. Spanich, Iron Workers Local 451 ("Iron Workers") and its agent Edward F. Peterson, and Wharf and Dock Builders and Pile Drivers Local Union No. 454 of the United Brotherhood of Carpenters and Joiners of America ("Wharf and Dock Builders").

Prior opinions may be consulted for a more detailed factual background.[3] The central facts are as follows. Julian and RSC signed a letter of intent, or "teaming agreement," in 1976 under which Julian was to act as general contractor in the construction of a solid waste disposal plant

---

**1.** Raytheon and RSC will, for convenience's sake, be referred to jointly as "Raytheon."

**2.** Two other defendants were voluntarily dismissed under Fed.R.Civ.Pro. 41(a): Dean E. Bensley and Metropolitan District Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America. Docket Item ("Dkt.") 93.

**3.** *See James Julian, Inc. v. Raytheon Co.,* 557 F.Supp. 1058 (D.Del.1983); *James Julian, Inc. v. Raytheon Co.,* 499 F.Supp. 949 (D.Del.1980). See also 93 F.R.D. 138.

for the Delaware Solid Waste Authority (the "Authority"). Julian's troubles began in 1978, when work on the project commenced. Its employees were represented by United Mineworkers District 50, now Local 15253 of the United Steel Workers of America, which was not a member of the Trades Council. At two meetings held in November of 1978, Raytheon representatives met with the Trades Council and its member unions. There is evidence that various union spokesman demanded at those meetings that project work be assigned to Trades Council unions and threatened to disrupt construction if their demands were not met. Picketing later occurred on several occasions. Raytheon, allegedly succumbing to union pressures, contracted a portion of project work to Raymond International Buildings, Inc. ("Raymond"), which employed Trades Council workers, and ultimately terminated Julian's contract.

The Iron Workers and Albert W. Spanich have moved for partial summary judgment on Count I of Julian's complaint, which alleges the Sherman Act violations. The remaining defendants have moved for summary judgment not only on the Sherman Act claim but also on the LMRA section 303 claim (Count III) and state tort claim (Count VI).[4]

The Court has already denied two potentially case dispositive motions in this case. In 1980 the Court denied a motion to dismiss for failure to state a claim upon which relief could be granted and for lack of subject matter jurisdiction. In that opinion the Court held that Julian alleged sufficient facts to state a Sherman Act claim against the defendants and that the claim fell outside of the "statutory" and "non-statutory" labor exemptions to the antitrust laws.

*James Julian*, 499 F.Supp. at 955–58. In addition, the Court held that Julian's complaint alleged a valid claim under section 303 of the LMRA for damages resulting from a violation of section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4) (1982).[5] Finally, the Court held that it had pendent jurisdiction to hear the state tort claims under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In February, 1983, the Court denied a motion for summary judgment brought by defendants Iron Workers and Peterson. Sufficient admissible and probative evidence existed, the Court held, to permit the question of an antitrust conspiracy to proceed to trial. *James Julian*, 557 F.Supp. at 1063–66. The Court also denied summary judgment on the section 303 and pendent state claims. *Id.* at 1066–67.

Although some new legal theories are now raised in the recent briefing, and although additional defendants have joined in this second summary judgment motion, the essence of the pending motion is a repeat of the prior motion: defendants contend that insufficient evidence exists to support an antitrust claim because of the various exemptions from antitrust liability enjoyed by labor unions. No significant discovery is relied upon in this motion that was not available at the time of the prior summary judgment motion. Thus, for the third time, the Court must deny defendants' motion and move this case towards trial.

## I. *Antitrust Claims*

Defendants claim that insufficient evidence exists of a conspiracy between themselves and Raytheon. Because the unions acted alone, defendants assert, the unions

---

**4.** Counts II, IV and V were limited to claims against the non-union defendants who are no longer parties to this action.

**5.** Section 8(b)(4) makes it an unfair labor practice for a labor organization, *inter alia*, to

threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where ... an object thereof is—

(A) forcing or requiring any employer ... to enter into any agreement which is prohibited by [section 8(e)];
(B) forcing or requiring any person ... to cease doing business with any other person
....

29 U.S.C. § 158(b)(4).

are immune from antitrust liability under the "statutory" antitrust exemption provided by sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113. *See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975); *United Mine Workers v. Pennington*, 381 U.S. 657, 661–62, 85 S.Ct. 1585, 1588–89, 14 L.Ed.2d 626 (1965). In any event, defendants argue, even if the unions did reach an agreement with Raytheon, such an agreement is entitled to "non-statutory" immunity because it was related to collective bargaining and was not entered into for the purpose of restraining competition. Finally, defendants contend, even if an agreement between themselves and Raytheon existed, and even if such an agreement is unprotected by an antitrust exemption, plaintiff's claim still must fail because Julian cannot show antitrust injury or unreasonable restraint of trade.

■ Plaintiff concedes that an agreement solely among the union defendants would be immune to antitrust attack. It is well settled that when unions act alone in their self interest their actions are statutorily exempt from the antitrust laws. *See Connell*, 421 U.S. at 622–23, 95 S.Ct. at 1835–36; *United States v. Hutcheson*, 312 U.S. 219, 232–33, 61 S.Ct. 463, 466–67, 85 L.Ed. 788 (1941); *Feather v. United Mine Workers*, 711 F.2d 530, 541 (3d Cir.1983); *Jou-Jou Designs, Inc. v. International Ladies Garment Workers Union*, 643 F.2d 905, 910 (2d Cir.1981). Instead, Julian contends that the Trades Council and its member unions pressured Raytheon into reaching an agreement to contract work to Raymond and then to terminate its contract with Julian. Although some agreements with non-union entities are entitled to non-statutory antitrust immunity, this agreement, Julian asserts, is not immune because it was not "sought or obtained in the context of a collective-bargaining relationship," *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 653, 102 S.Ct. 2071, 2076, 72 L.Ed.2d 398 (1982).

## A. Agreement with Non-Union Entities

The Court must first address defendants' primary argument on summary judgment: that the unions acted alone, not in concert with a non-union entity.

■ Summary judgment is a drastic remedy which the Court may resort to only if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 95 (3d Cir.1982). Moreover, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* In this case defendants have filed sworn affidavits denying the existence of an agreement or conspiracy. Plaintiff is therefore not entitled to rest solely on its complaint. It must produce "significant probative evidence" demonstrating the existence of a factual dispute as to the allegations in its complaint. *Sunshine Books*, 697 F.2d at 96; *James Julian*, 557 F.Supp. at 1062.

■ Special difficulties arise in assessing summary judgment motions which turn on whether evidence exists to support the existence of a conspiracy. As the Third Circuit Court of Appeals recently observed in *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3d Cir. 1983), conspirators in an illegal enterprise rarely leave trails of direct evidence proving the agreement. *Id.* at 304. "Broad latitude" is therefore permitted for the inference of facts from "the totality of the circumstances." *Id.* Only when "reasonable inference-drawing degenerates into groundless speculation" will circumstantial evidence prove insufficient to support an inference of conspiracy. *Id.* "All admissible evidence, direct and circumstantial," must be examined "in order to determine what legitimate inferences could be drawn as to the ultimate facts in issue," and this must be done without "fragmentizing or compartmentalizing the evidence." *Id.* at 305. *See Continental Ore Co. v. Union*

*Carbide & Carbon Corp.*, 370 U.S. 690, 698–99, 82 S.Ct. 1404, 1410–11, 8 L.Ed.2d 777 (1962).

As in the prior opinion, the Court believes plaintiff has produced significant probative evidence demonstrating the presence of a factual dispute as to existence of a conspiracy with Raytheon. Although this evidence might not be compelling to a jury, and although proceeding to trial might prove costly and wasteful, the Court is not permitted to grant summary judgment merely because it believes that the plaintiff's case might be stronger. Only in the absence of any significant probative evidence of a conspiracy may a district judge cut short a plaintiff's right to a full trial on the merits.

Three incidents in particular motivated the Court's earlier holding denying the Iron Workers' summary judgment motion: Peterson's attendance at the November 8, 1978, meeting between the Authority, the Trades Council and Raytheon; his attendance at the July 5, 1979, meeting of the Trades Council; and the Iron Workers' participation in October, 1979, picketing. *James Julian*, 557 F.Supp. at 1063. The Court explained: "[T]he act of picketing, when coupled with attendance at the November 8, 1978, meeting where unlawful actions were discussed, adequately links

moving defendants with the unlawful purpose." *Id.* at 1065.

Julian conclusively has demonstrated participation in picketing and attendance at meetings. The existence of a conspiracy is very much an issue and this case should go to a jury. While Julian may not ultimately prevail against moving defendants, it is not the province of this Court, at this juncture, to deprive it of the right to proceed."

*James Julian*, 557 F.Supp. at 1065.[6]

■ The above is as true today as it was last February. The Court will not parse in detail the evidence for a second time. Plaintiff has produced evidence placing defendants at meetings with Raytheon and connecting defendants with the picketing of Julian's job site. Plaintiff further has produced evidence of communications between Raytheon, Authority and union personnel, relating to the Trade Council's jurisdictional complaint, up until the time of Julian's termination. Briefing by defendants isolates various communications made by specific individuals and segregates events in an effort to establish that the occurrences in 1978 and 1979 do not, in aggregate, form a conspiracy.[7] That effort constitutes precisely the sort of fragmentizing and compartmentalizing forbidden in summary judgment.

---

**6.** Although the prior opinion focused on the Iron Workers' involvement in a conspiracy with the *other unions* rather than on the role played by *Raytheon* in the alleged conspiracy, the briefing did contend that no conspiracy with non-labor parties existed. *See* Opening Brief of Defendants Iron Workers and Peterson in Support of Motion for Summary Judgment, Dkt. 112 at 8; Reply Brief of Defendants Iron Workers and Peterson in Support of Motion for Summary Judgment, Dkt. 121 at 14–15. Thus, despite defense counsel's contention to the contrary at oral argument, *see* Transcript of June 12, 1984, Hearing, Dkt. 161, at 59–60, the issue of Raytheon's involvement in the alleged conspiracy was not raised for the first time in the pending motions.

**7.** They also argue that Julian needs "clear proof" that statements by various individuals were authorized or ratified by each defendant and needs "hard evidence" of a conspiracy.

Those are not, however, appropriate summary judgment standards. There is significant probative evidence tending to show that the union defendants acted jointly in furtherance of a common goal. *See* Minutes of November 16, 1978 Business Agents Meeting, Dkt. 157, at A–370 (describing "Raytheon Problem" and "possible meeting tomorrow with Operating Engineers, Wharf and Dock Builders and Raytheon"); Deposition of James Au, Dkt. 157, at A–421–A–422 (describing job site encounter with John McCrae, Business Manager and President of Wharf and Dock Builders, Joe O'Donoghue, Business Manager of Local 542, and Al Spanich, President of Local 542); Deposition of James Au, Dkt. 157, at A–466 (describing picketing in October 1979 as a "combination of all the Building Trades Council"); Minutes of December 17, 1979 Special Business Agents Meeting, Dkt. 157, at 371 (describing President DiMauro's report on "present status of developments at Pigeon Point Landfill Project").

Defendants further argue that an antitrust conspiracy between Raytheon and the union defendants may not be inferred merely from evidence that Raytheon responded to union secondary pressures. They rely on Judge Shapiro's recent opinion in *Altemose Construction Co. v. Building & Construction Trades Council*, No. 73–773 (E.D.Pa. July 5, 1983). Judge Shapiro explained in *Altemose* that

> It would at best be "mere speculation." as well as contradictory to the intent of labor's statutory exemption, if a jury were permitted to draw an inference of conspiracy from the favorable results of union secondary tactics.

*Id.,* slip op. at 63. *See also C & K Coal Co. v. United Mine Workers,* 704 F.2d 690, 699 (3d Cir.1983).

Julian, however, unlike Altemose Construction Co., rests its case on more than evidence that employers responded to secondary tactics. Julian has produced evidence of meetings attended by representatives of Raytheon and of communications between union officials and Raytheon.[8] Evidence of an agreement in this case

therefore surpasses mere speculation. This is evidence which "tends to exclude the possibility that the [Unions] and [Raytheon] were acting independently," *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), and tends to prove a "conscious commitment to a common scheme designed to obtain an unlawful objective." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300. (1981).

■ That the agreement, if any, may have been produced by coercion, does not immunize it from antitrust liability. In *Connell,* a union picketed a general contractor to extract an agreement under which the contractor would subcontract work only to firms under contract with the union. The contractor signed the agreement under protest and brought suit to challenge its legality. The Supreme Court held that the agreement was subject to antitrust scrutiny.[9]

---

8. Evidence that seeds of conspiracy were planted at the November 8, 1978, meeting include a memorandum by Robert J. Storella, RSC's Senior Contract Administrator, which states, in part:

> a. Since the present pile testing is almost completed anyway, the Operating Engineers will not insist on replacing the 4 "non-union" workers with union operators provided that Raytheon assures the Building and Trades that 100% union personnel (i.e. Building and Trades) will be used when the job itself is actually started.
> b. They want our answer by this Friday (11/10). If it is not a favorable reply, the Operating Engineers and the Dock Workers will put up a picket line at the site on Monday morning.
> c. We told them we would give them our answer by Friday.

Dkt. 157, at A–307. Storella later explained that RSC "required Julian to utilize a Building Trades Contractor, Raymond International, to drive piles rather than his own work force," and described this move as "a concession to achieve labor peace based on threats of a picket." Letter from Robert J. Storella to N.C. Vasuki, June 27, 1979, Dkt. 157, at A–324. Evidence further shows that Theodore W. Ryan, President of the Trades Council, knew of the contract modification giving Raymond the pile work through con-

versations with Vasuki, Contract Officer at the Delaware Solid Waste Authority. *See* Deposition of T. Ryan at 76–77, Dkt. 157, at 534–335.

With respect to Julian's ultimate termination, there is further evidence of conspiracy. Evidence shows that Jacob Kreshtool, an attorney for the Operating Engineers, told Vasuki in late October, 1979, that he would file suit challenging an Authority bond issue but that the suit would be dropped if the entire project were given to Building Trade workers. *See* November 1, 1974, Memorandum from J.J. Mahon to E.L. Kane, Dkt. 157, at A–348. Furthermore, on December 5, 1979, Dean Bensley, RSC's President, wrote to Vasuki and explained that he had been "in direct contact with Mr. DiMauro," and had told DiMauro that RSC considered the Building Trades "as potential allies on this project." Dkt. 157, at A–350. Although this evidence is merely circumstantial, and although it is far from convincing, the Court cannot conclude that it is neither significant nor probative of a conspiracy.

9. Justice Douglas dissented specifically on the grounds that no conspiracy was alleged because Connell "maintained only that Local 100 coerced it into signing the subcontracting agreement." *Connell,* 421 U.S. at 638, 95 S.Ct. at 1842 (Douglas, J., dissenting).

The concept of a coerced agreement violating antitrust law is not peculiar to the labor arena.

The Third Circuit Court of Appeals has ventured even further than the *Connell* Court, extending liability not only to *unions* who coerce agreements from employers, but also to *employers* who accede to union demands. In *Consolidated Express, Inc. v. New York Shipping Association*, 602 F.2d 494 (3d Cir.1979) ("*Conex*"), the Court of Appeals explained that it was not unfair to require employees to "resist excessive union claims." *Id.* at 520.

> Employers are not, after all, without remedies against illegal demands. They can refuse to bargain and the Board will, we must presume, sustain that refusal to bargain. They can accede to the union demand, and then sue, as Jewel Tea Company and Connell Construction Company did, to invalidate the agreement under federal law. Or they can simply refuse to implement the agreement, once adopted, because it is in violation of § 8(e) .... [A]ffirmative obligations imposed by nonlabor federal statute may on occasion require an employer to resist illegal union demands even at the cost of a strike.

*Id. See also Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council*, 609 F.2d 1368, 1375 (3d Cir.1979) ("*Muko I*") (agreement entered into as result of union handbilling could be found to violate antitrust laws).[10]

In this case, so long as an agreement existed between Raytheon and the defendants, it is irrelevant for antitrust purposes whether Raytheon entered the agreement happily or grudgingly.

**B.** *Non-Statutory Exemption*

Defendants argue that even if an agreement existed between themselves and Raytheon, the agreement is entitled to non-statutory antitrust immunity because 1) the unions' purpose was to protect and standardize area wage standards and working conditions; 2) the unions' actions were lawful under section 8(e) of the NLRA (the "construction industry proviso"); and 3) the unions lacked predatory intent.

**1.** *Area Standards Protest*

■ The non-statutory exemption generally applies "when a union, acting with a non-labor party, seeks to attain goals which are mandatory or permissive subjects of bargaining under the National Labor Relations Act, unless the Union acts with a predatory anti-competitive purpose." *Feather v. United Mine Workers of America*, 711 F.2d 530, 542 (3d Cir.1983). The non-statutory exemption thus serves as an accommodation to labor goals by protecting conduct that otherwise might constitute a violation of federal antitrust law. *See Connell*, 421 U.S. at 622–23, 95 S.Ct. at 1835; *James Julian*, 499 F.Supp. at 956.[11]

■ Defendants claim exemption for their activities because, they argue, their picketing was confined to the purpose of standardizing area wages and working conditions. Such a purpose, they correctly ar-

---

It has long been held that group boycotts and vertical price restraints imposed by a manufacturers or suppliers on their retailers through threats or coercion may constitute "agreements" subject to antitrust attack. *See, e.g., Monsanto Co. v. Spray-Rite Service Corp.*, 104 S.Ct. at 1471 & n. 10. *Altemose*, where no evidence of an agreement existed, is fully consistent with this rule.

**10.** Professor Areeda, commenting on *Muko I*, argues that it is "strange to extract treble damages from the victim of lawful union pressure who had no choice but to acquiesce in the union's demands if he wished to survive." P. Areeda, *Antitrust Law* ¶ 229.2a, at 83 (Supp. 1982). He nonetheless recognizes the existence of a contrary argument, similar to that raised in the *Conex* case, that "antitrust liability would stiffen the resistance of the victim so as to discourage the union from exerting the pressure." *Id.*

**11.** The outer limits of the exemption were delineated by the Third Circuit Court of Appeals in *Muko I*:

> [A]n agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.

*Muko I*, 609 F.2d at 1373.

gue, even if achieved through agreement with non-union entities, is immune from antitrust liability. As the Supreme Court in *Connell* explained:

> The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organized workers and standardizing wages ultimately will effect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions.

*Connell*, 421 U.S. at 622, 95 S.Ct. at 1835. *See also Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 689, 85 S.Ct. 1596, 1601, 14 L.Ed.2d 640 (1965).

■ Evidence exists in this case, however, from which a jury could conclude that defendants' purpose was not restricted to protecting area wages and working conditions. Rather, record evidence exists supporting Julian's contention that the defendants picketed to force Julian to hire Trades Council labor in place of Steel Workers labor and to force Raytheon to agree to terminate Julian. The unions' use of signs announcing an area standards protest during certain picketing does not establish as a matter of law that the unions were not also pursuing a less publicized objective. *See N.L.R.B. v. International Brotherhood of Electrical Workers, Local 265*, 604 F.2d

1091, 1097 (8th Cir.1979); *San Francisco Local Joint Executive Board of Culinary Workers, Bartenders, Hotel, Motel and Club Service Workers*, 203 NLRB 199 (1973), *aff'd*, 509 F.2d 537 (D.C.Cir.1975). As this Court previously stated:

> what might facially appear as a legitimate picket line may well have illegitimate, secondary motives. *See Bexar Plumbing Co., Inc. v. NLRB*, 536 F.2d 634, 636 (5th Cir.1976); *NLRB v. Local 307, Plumbers United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (ALC–CIO)*, 469 F.2d 403, 408 (7th Cir.1972). The current factual scenario neatly fits within these cases—despite avowed legitimate goals of picketing, substantial evidence supports an inference that the real goal was the preclusion of Julian. As such, summary judgment is inappropriate.

*Julian*, 557 F.Supp. at 1066–7 (footnote omitted).

### 2. Section 8(e): Construction Industry Proviso

The unions claim exemption under section 8(e) of the Labor Management Relations Act, 29 U.S.C. § 158(e).[12] Section 8(e) generally makes it an unfair labor practice for a labor organization to enter into a "hot cargo" agreement with an employer. Nonetheless, the "construction industry proviso" to section 8(e) protects agreements between unions and employers in the construction industry "relating to the con-

---

**12.** Section 8(e) provides in part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided,* That nothing in this subsection shall apply

to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .

29 U.S.C. § 158(e).

Agreements protected by the construction industry proviso to section 8(e) are also protected from antitrust liability. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85, 102 S.Ct. 851, 860, 70 L.Ed.2d 833 (1982); *Altemose*, slip op. at 43–44 & n. 67.

tracting or subcontracting of work to be done at the site of construction . . . ."

■ The proviso is not, however, as broad as it might literally appear. According to the Supreme Court, the proviso does not exempt subcontracting agreements "that were not sought or obtained in the context of a collective bargaining relationship, even though they [are] covered by the plain language of the statute." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. at 653, 102 S.Ct. at 2076. Thus, where "stranger" picketing is used to pressure an employer with whom the union has no collective bargaining relationship, "and whose employees it ha[s] no interest in representing, into signing union signatory subcontracting agreements," the agreements are unprotected. *Id.* at 653–54 n. 8, 102 S.Ct. at 2076–77 n. 8.

■ Here, evidence supports Julian's allegation that Raytheon agreed with the unions to cease doing business with Julian in order to replace Steel Workers with Trades Council employees. The unions and Raytheon were not in a collective bargaining relationship nor did they execute a subcontracting agreement such as that approved in *Woelke and Romero*. Rather, as in *Connell*, there is evidence to suggest that the unions had no interest in representing Julian's or Raytheon's employees and instead sought to require Julian or Raytheon to subcontract with *other* companies hiring Trades Council employees. Furthermore, evidence suggests that the unions' final goal was to require Raytheon to replace Julian with a different contractor entirely, and have *that* contractor hire (or subcontract others to hire) Trades Council labor.[13]

Defendants Operating Engineers and Spanich argue that "if Local 542 had suc-ceeded and Julian had been forced to employ Operating Engineers, it would *not* have occurred in the absence of Julian signing a collective bargaining agreement." Opening Brief of Operating Engineers and Spanich, Dkt. 152, at 40. The record, however, does not evidence union desire to form a collective bargaining relationship with Julian, nor is that Julian's theory. Instead, Julian contends that defendants sought to pressure Raytheon to subcontract work to employers *other than Julian* and, eventually, to force Julian off the project entirely. These actions do not fall within a collective bargaining relationship any more than did those in *Connell*.

Taking a different approach, the other defendants argue that a collective bargaining relationship existed because Julian and Raytheon were engaged in a "joint venture" and should be treated as "joint employers" of all project employees. *See* Opening Brief of Defendants Building Trades Council, DiMauro, Ironworkers, Peterson and Wharf & Dock Builders, Dkt. 150 at 28–29. "[A]n agreement between the unions and Raytheon would possess a sufficient collective bargaining nexus," they argue, to satisfy *Connell. Id.* at 29. Defendants cite no support for their joint venture theory, nor does the court believe that Julian should be considered a "joint employer" of workers who are engaged in work for a subcontractor which was assigned work against Julian's wishes allegedly belonging to Julian. In any event, Julian certainly cannot be considered a joint employer under an arrangement between the unions and Raytheon which provided for Julian's termination from the construction project.

### 3. *Predatory Intent*

Defendants argue that Julian must, under Supreme Court precedent, prove that

---

**13.** This case does not involve a dispute, outside the collective bargaining context, involving "shoulder-to-shoulder" friction between union and non-union workers. *See James Julian*, 499 F.Supp. at 957; *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. N.L.R.B.*, 654 F.2d 1301, 1319–21 (9th Cir.1981) (en banc), *aff'd sub nom, Woelke & Romero*, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (*Connell* presents alternative requirements of either a collective bargaining relationship or a threat of shoulder-to-shoulder friction with non-union workers). Rather, it involves a territorial dispute between workers represented by *different* unions, not the type of "shoulder-to-shoulder" friction described by the Supreme Court in *Connell* or *Woelke & Ramero*.

the unions acted with predatory intent in order to establish a valid antitrust claim. The evidence in this case, defendants argue, shows only that the unions sought to preserve area wage standards, not that they intended to ruin competition.

■ The Court cannot agree with either contention. The Supreme Court's plurality opinion in *Pennington* has generally been interpreted as requiring proof of predatory intent where the challenged agreement concerns "subjects at the 'very heart' of the collective bargaining process." *Conex*, 602 F.2d at 516; *Smitty Baker Coal Co. v. United Mine Workers*, 620 F.2d 416, 428–30 (4th Cir.1980), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); 1 P. Areeda & A. Turner, *Antitrust Law*, ¶ 229e, at 211 (1978). A different analysis, however, has been applied in other contexts. As the Third Circuit Court of Appeals explained in *Conex*, the Supreme Court in *Connell* abandoned the intent requirement of *Pennington*. Where an agreement entered into outside of the collective bargaining context imposes a "direct restraint on the business market" with anticompetitive effects not flowing "naturally from the elimination of competition over wages and working conditions," predatory intent is irrelevant. *See Conex*, 602 F.2d at 517, *quoting Connell*, 420 U.S. at 625, 95 S.Ct. at 1836.[14]

■ As explained earlier, the Court cannot decide on summary judgment that

defendants' goal was limited to preserving area standards. The jury must decide whether defendants sought only to protect area wage standards or whether they sought to eliminate Julian from the project site in order to replace Steel Worker members with Trades Council union members. If the latter was their purpose, their alleged agreement with Raytheon would, indeed, have a direct anticompetitive effect on the business market not flowing naturally from the elimination of competition over wages and working conditions. As in *Connell*, it would have the effect of excluding an employer from the market despite a competitive advantage the employer might enjoy because of efficiencies and would thus restrain trade more than was necessary to achieve a legitimate labor goal. *Conex*, 602 F.2d at 518–20.[15]

### C. Anticompetitive Effects

Defendants argue that Julian has not established sufficient injury to competition to support its antitrust claim.

■ An agreement is unlawful under section 1 of the Sherman Act[16] only if it results in an *unreasonable* restraint of trade. *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council*, 670 F.2d 421, 428 (3d Cir.1982) (*"Muko II"*). The mere fact that an agreement, like that in *Con-*

---

14. The Third Circuit's brief one-sentence summary of the non-statutory exemption in *Feather* which indicated that "generally" a predatory purpose is required, *Feather*, 711 F.2d at 542, cannot be read as overruling the extensive interpretation of *Connell* contained in *Conex* and reaffirmed in *Muko II*.

15. The *Conex* court created a defense in damage actions, not available in declaratory judgment or injunctive actions, for cases in which the defendant "could not reasonably have foreseen that the subject matter of the agreement being challenged would be held to be unlawful under § 8(b)(4) or § 8(e)" and where the agreement was "'intimately related' to the object of collective bargaining thought at the time to be legitimate, and went no further in imposing restraints in the secondary market than was rea-

sonably necessary to accomplish it." *Conex*, 602 F.2d at 521; *see also Feather*, 711 F.2d at 542. The availability of this defense is an issue which must be litigated at trial.

16. Defendants have ignored entirely plaintiff's Sherman Act section 2 claim. To the extent plaintiff alleges an attempt to monopolize, effect on the market place is irrelevant (although probable effect is very relevant). *See United States v. Columbia Steel Co.*, 334 U.S. 495, 531–32, 68 S.Ct. 1107, 1126–27, 92 L.Ed. 1533 (1948) (reasonable restraint of trade not in violation of section 1 may nonetheless constitute an attempt to monopolize under section 2); *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) (attempt to monopolize claim needs proof of intent and dangerous probability of success).

*nell,* has some anticompetitive effects not flowing naturally from the elimination of competition over wages and working conditions does not lead automatically to a conclusion that the agreement violates the antitrust laws. That is, an agreement which under *Connell* is found unprotected by the labor exemption must still be examined under traditional antitrust analysis to determine if it has a sufficient anticompetitive effect to constitute an antitrust infraction. *Muko II,* 670 F.2d at 426–27.[17]

The parties have not briefed the issue of whether a rule of reason or *per se* analysis should apply, although implicit in defendants' briefs is the assumption that rule of reason is appropriate. Plaintiff's brief argues that even under rule of reason analysis it has demonstrated sufficient competitive injury to survive summary judgment. Under the *per se* rule the alleged agreement between defendants and Raytheon would be "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it] caused or the business excuse for [its] use." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In contrast, a rule of reason approach would require the trier of fact to conduct "a detailed examination of the affected business and the nature of the restraint imposed." *Muko II,* 670 F.2d at 428.

The Court holds in this case that rule of reason analysis must apply and agrees with Julian that the issue of antitrust liability must await trial. The Third Circuit Court of Appeals in *Muko II,* while rejecting the position offered by some commentators that conduct in the labor area should never be *per se* unlawful, warned against "mechanical or imprudent application of the *per se* rule in the labor context."

*Muko II,* 670 F.2d at 427; *see* Handler & Zifchak, *Collective Bargaining and the Antitrust Laws: The Emasculation of the Labor Exemption,* 81 Colum.L.Rev. 459, 511 (1981).[18] The Court explained that only "classic" group boycotts—those involving attempts by competitors to exclude horizontal competitors—are *per se* unlawful. *Muko II,* 670 F.2d at 430. *Muko II* involved an action by a non-union contractor against a fast-food chain operator and two labor trades councils challenging an agreement between the councils and the fast-food operator to hire only trades council labor. The agreement was not, the *Muko II* court held, a classic group boycott. 670 F.2d at 432.

> Simply put, a small retailer has been picketed by a union. To preserve its business, the firm agrees to purchase union-made goods in the future. We cannot agree with Muko ... that this is the kind of behavior against which the *per se* rule traditionally has been invoked.

*Id.*

Similarly, in this case Julian alleges only picketing of a local builder and an agreement to purchase services of particular unions in the future. To borrow language from *Muko II,* "this is not a case in which one competitor, through concerted action with a supplier or customer, attempts to cut another, horizontal competitor out of the market place."[19] *Muko II,* 670 F.2d at 432. There is no "suggestion of attempted price fixing." *Id.* "The record is barren of anything to suggest that either of the defendants wished, through their concerted action, to gain advantage over [Julian] in an *economic* or *competitive* sense." *Id.* "[U]nlike *Conex,* in which the defendant union imposed a widespread restraint of trade affecting the entire shipping indus-

---

**17.** Nor does a finding that the agreement violates section 8(e) *per se* make the agreement illegal. *Muko II,* 670 F.2d at 427 n. 5.

**18.** Earlier language in *Conex* had suggested that conduct which stripped a union of its antitrust exemption would necessarily constitute an antitrust violation, *see Conex,* 602 F.2d at 523–24, but *Muko II* limited the holding of *Conex* as

applying to a case involving a classic group boycott. *Muko II,* 670 F.2d at 427.

**19.** It may be a case in which one *union* attempts to cut another *union* from the marketplace, but plaintiffs wisely have not suggested that such action would lose the protection of Clayton Act sections 6 and 20.

try, the 'refusal to deal' in this case involved only one relatively small buyer." *Id.*[20]

Under a rule of reason analysis, the Court is unable to state as a matter of law that defendants did not unreasonably restrain competition in the relevant market.[21] Plaintiff has presented expert evidence tending to show that defendants harmed competition in several geographic and product markets. *See* Report of Dr. Jeffrey Perloff, Dkt. 157, at A–205. Defendants have offered no expert rebuttal evidence and, in fact, have entirely ignored Julian's expert report in their briefs. Thus, the Court cannot grant summary judgment on the issue of whether defendants unreasonably restrained trade.

II. *Section 303 and State Tort Claims*

■ Defendants other than Operating Engineers and Spanich have moved for summary judgment on Julian's remaining claims, arguing, first, that picketing and violent conduct by the Operating Engineers cannot be attributed to their organizations and, second, that any picketing they themselves conducted was limited to the "primary" objective of protecting area standards.[22] As explained earlier, however, these issues cannot be decided on summary judgment. Although plaintiff's task at trial will be burdensome, the Court cannot hold that no material issue of fact remains to be litigated. Some evidence exists suggesting a secondary objective behind the unions' picketing, thus precluding summary judgment on the section 303 claim. In

addition, evidence supports a conspiracy or agency theory, which might impose liability on defendants for the tortious acts committed by others.[23] As a consequence, defendants' motion must be denied on Julian's remaining claims.

An appropriate order will issue.

---

20. While this case is distinguishable from *Muko II* as involving a termination of an existing contract, that distinction, alone, is insufficient to make defendants' alleged actions *per se* illegal under the antitrust laws.

21. If the Trades Council unions had sought solely to substitute themselves as Julian's employees in place of the Steel Workers, that effort would not constitute an antitrust violation because it would not have lead to a net increase in restraint of trade over that created by the existing arrangement between Julian and the Steel Workers. *See Jou-Jou Designs v. International Ladies Garment Workers Union,* 643 F.2d 905, 910 (2d Cir.1981). Evidence supports Julian's theory, however, that the unions forced Julian off the project site, thus affecting competition

beyond the substitution in a collective bargaining relationship of one group of employees for another.

22. Section 8(b)(4) prohibits only picketing for "secondary" objectives, not "primary" objectives. *See National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 619–33, 87 S.Ct. 1250, 1254–62, 18 L.Ed.2d 357 (1967). Area standards picketing would not involve an unlawful objective, while picketing to force one party to cease doing business with another would. *See id.*

23. The parties have not briefed the state tort law question of vicarious tort liability under a conspiracy or agency theory.